**UNITED STATES of America**

v.

**Hugh J. ADDONIZIO, Appellant in No. 19391, et al.**

**Appeal of Ralph VICARO in No. 19295.**

**Appeal of Anthony P. LA MORTE, Appellant in No. 19392.**

**Appeal of Joseph BIANCONE, Appellant in No. 19393.**

**Nos. 19295, 19391–19393.**

United States Court of Appeals, Third Circuit.

Argued Feb. 18, 19, 1971.

Decided Sept. 16, 1971.

As Amended Sept. 24, 1971 and Jan. 6, 1972.

Certiorari Denied Feb. 22, 1972. See 92 S.Ct. 949.

Bernard Hellring, Hellring, Lindeman & Landau, Newark, N. J. (Michael Edelson, Paterson, N. J., on the brief), for Hugh J. Addonizio and others.

Peter S. Valentine, Glickman & Valentine, Newark, N. J (Julius A. Feinberg, Bloomfield, N. J., on the brief), for Anthony P. La Morte.

Thomas R. Dyson, Jr., Washington, D. C., for Joseph Biancone.

Herbert J. Stern, U. S. Atty, Newark, N. J. (Garrett E. Brown, Jr., John W. Bissell, William Braniff, Asst. U. S. Attys., and Donald W. Merkelbach, Special Asst. U. S. Atty., Frederick B. Lacey, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before FREEDMAN,* SEITZ and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Appellants, along with eleven others,[1] were named as defendants in an indictment containing one count charging a conspiracy to interfere with interstate commerce by means of extortion, and sixty-five counts charging substantive acts of extortion pursuant to the conspiracy, in violation of 18 U.S.C. § 1951 (the Hobbs Act).[2] After a trial of seven

Patrick M. Wall, New York City, for Ralph Vicaro.

* Judge Freedman participated in the consideration of these cases, but died before any disposition was made.

1. Of the 15 original defendants, two (Gallo and Giuliano) died before the trial, five (Krusch, Frank Addonizio, Bernstein, West and Turner) were severed prior to trial, two (Ruggiero Boiardo, Jr. and Norman Schiff) were severed during trial due to illness, and one (Callahan) pleaded guilty during the course of trial to the crime of filing a false tax return in violation of 26 U.S.C. § 7206(1) and was thereafter severed from the trial. Philip Gordon was convicted with appellants on all counts but had not been sentenced at the time of this appeal.

2. The pertinent portions of § 1951 read as follows:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

\* \* \* \* \*

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

weeks, the jury returned a guilty verdict against all the appellants on the conspiracy count and all but two substantive counts.[3] On September 22, 1970, Addonizio, Biancone and La Morte were each sentenced to ten years in prison. In addition, Addonizio and Biancone were each fined $25,000.00; La Morte was fined $10,000.00. Vicaro was sentenced to twelve years in prison and fined $10,000.00.

I.

THE EVIDENCE

The Government's theory was that, from as early as 1962 until the date of the indictment, there existed a conspiracy including as its members at various times, the Mayor of Newark, New Jersey (appellant Addonizio), certain members of the city government (including appellant LaMorte) and a group headed by defendant Boiardo (including appellants Biancone and Vicaro), the object of which was to extort kickbacks from contractors, suppliers and engineers engaged in public work projects with the city of Newark, and that in many specific instances the object of this conspiracy was attained. Most of the evidence at trial related to two major city projects—the Southside Interceptor Sewer System (the "Southside project") and the Southerly Extension of Newark's water supply system (the "Southerly Extension"). The following is a capsulized version of the evidence relating to those two projects, viewed in the light most favorable to the Government.

A. *The Southside Project.*

Plans for this sewage project began in 1954, with the initiation of the first of two preliminary surveys by the engineering firm of Elston T. Killam Associates (Killam). In 1964, Mayor Addonizio's administration awarded Killam a contract for both the design and the construction supervision phases of this project. The plan called for the installation of an interceptor sewer system through which sewage would be transported from the city of Newark to a treatment plant operated by the Passaic Valley Sewage Commission.

One element of the extortion scheme involved the potential suppliers of pipe for this project. Since the Sewage Commission charged the city of Newark for the volume of sewage entering the plant as measured by a metering device, the Killam firm placed great emphasis on the necessity of obtaining pipe with minimum leakage, since ground water leaking *into* the pipe would increase the metered flow and add to the cost to the city. Killam's drawn specifications therefore required that the pipe to be used be fabricated with rubber and *steel* joints, the closest fitting joints available. Several companies, including the International Pipe and Ceramic Company ("Interpace", formerly Lock Joint Pipe Company), manufactured pipes with rubber and steel joints. Defendant Gallo owned several companies which made only pipe with rubber and *concrete* joints, which permitted much greater leakage.

Killam vigorously and successfully opposed an effort by LaMorte, then assistant to the Newark Director of Public Works and later Director, to substitute rubber and concrete joints in the specifications and increase the leakage allowance by 25%. LaMorte, however, succeeded in having Killam reluctantly include the rubber and concrete joints as an alternate in the specifications. LaMorte then met with Harry Gillespie, an executive of Interpace, and informed him that the job was his—so long as the required 10% was forthcoming. Interpace, a manufacturer of both types of joints, eventually refused to go along.

When Paul Rigo, an engineer with the firm which eventually replaced Killam, spoke to Mayor Addonizio concerning the superiority of rubber and steel joints, the Mayor informed him that the pipe would be supplied by Gallo, since he, the Mayor,

---

3. Counts 65 and 66 were dismissed by the court with the consent of the Government prior to submission of the case to the jury.

"had an interest in [him]." Gallo had by this time expressed his willingness to Sepede, a project engineer, to pay a required ten percent kickback in order to obtain the supply contract. Alerted by Gillespie, several councilmen raised the issue of the two types of pipe at a council meeting and questioned the propriety of using rubber and concrete joints. In response, the Mayor twice stated, falsely, that only Interpace, which had withdrawn from the bidding, manufactured pipe with rubber and steel joints. In fact, a number of firms, including the New Jersey plant of the Martin Marietta Company, manufactured such pipe. The contract to supply the pipe was ultimately awarded to Gallo.

In the meantime, Killam had been forced out of the project because it refused to pay any kickback. LaMorte, accompanied by an otherwise-unidentified "Mr. B.," informed Killam's vice-president, Joseph Foley, at a luncheon that Killam had somehow "slipped through" the city's system of "kickbacks or shakedowns" and would thereafter be required to kick back 5% of its fee. Foley refused. Later Chairman of the Board, Elston Killam, and President Peter Homack, were summoned to City Hall. When they arrived, they went to the office of the Director of Public Works, where they were intercepted by LaMorte. He introduced them to the appellant, Biancone (who never had any official connection with the city government). Biancone took Killam and Homack into the Mayor's office and introduced them to Mayor Addonizio as the engineers who were designing the Southside project. Immediately after the introduction, however, Biancone and LaMorte took the engineers into the corridor outside of the Mayor's office where Biancone informed Killam and Homack that the administration wanted 5% of the firm's engineering fee. Killam refused, Biancone then demanded 4%, then 3%. Killam refused each demand and said he would pay nothing. He indicated he would not be involved in any kickback, would rather give up the contract on Southside, as well as other work he had secured from the City several years earlier and prior to Addonizio's election as Mayor. A few days later, Killam, despite ten years of work on the project, withdrew from it.

The Killam contract was thereupon assigned to a partnership involving Dr. Charles Capen, an elderly engineer, and John Sepede who, unknown to Capen, had already agreed with the defendant Boiardo to pay the required 10%. Sepede soon became ill with cancer, however, and Capen called Paul Rigo, a young engineer, and asked him to help on the project. Rigo accepted. The day he began work Sepede died.

It was not until several weeks later, in March 1965 that Rigo learned of the Boiardo-Sepede "deal" when LaMorte summoned Rigo to accompany him to meet the "real boss" of Newark. Rigo drove to the offices of Valentine Electric in Newark, where LaMorte introduced him to the defendant Ruggiero "Tony Boy" Boiardo. La Morte remained outside the room during the ensuing conversation between the two. Boiardo told Rigo that if he wanted to get paid for the work he had done, and to continue to be paid, he would have to pay to Boiardo, in cash, 10% of all monies he received. Boiardo would, in turn, "take care of" the Mayor, council and "anybody else that has to be taken care of down there." Boiardo said this had been the deal with Sepede and that Rigo was going to be bound by it. Rigo, confronted by the demand, refused to pay. Boiardo said "everybody in Newark pays 10% or they don't work in Newark and they don't get paid in Newark. Look what happened to Killam. He didn't get paid or [sic] he didn't pay. He is not in Newark and he is going to sweat a long time before he gets what is owed him."

Faced with these threats, Rigo asked that the demand be lowered to 5%. Boiardo refused, and told Rigo that he, Boiardo, and his group had a plumbing supply firm (the Kantor firm, discussed below) which could cash Rigo's checks for a fee and issue him covering bills.

Rigo, protesting that as an engineer he could not justify bills from a plumbing supply firm, told Boiardo that he would have to use his own corporation, Constrad, to cash the checks. Boiardo said that he did not care how Rigo got the cash, but that he had better get it. Rigo capitulated. Boiardo then told him he would be paid soon and that "somebody" would be in touch with him.

After Rigo received the first check, he received a call from someone who sounded like Boiardo, who asked if the payment was ready and said that someone would be down to pick it up that day. Later, Mario Gallo arrived and obtained the first payment. After Rigo received his second check, Gallo again picked up 10% in cash. On the third occasion, LaMorte was the man who phoned to ask if the payment was ready. LaMorte then came to the job site and introduced Rigo to Biancone, the Boiardo man designated to pick up this and later cash payments from Rigo. Rigo testified that he made these payments because he feared that, if he did not, he would cease to receive payments for work already completed.

In the meantime, action had been taken to bring the contractors into line. Biancone, Gallo and Sepede (when he was still alive) agreed that they and their coconspirators would require payments from contractors and suppliers totalling 10% of the contract price, or approximately one million dollars. Contractors interested in the work were advised of what was expected. Ralph Cestone, owner of the Verona Construction Company, was one of the contractors approached by Sepede, Gallo and Biancone. He refused to meet the demands or to join the joint venture of contractors who had agreed, and withdrew from the bidding. The Southside project was subsequently awarded to a joint venture of four separate contractors—C. Salvatore and Sons, Mal-Bros. Contracting Co., The Catt Corp., and C. F. Malanka and Sons, Inc.

The kickbacks were made through the bank account of the fictitious "Kantor Supply Company." Irving Kantor, who was in the plumbing supply business, was approached in 1962 by Biancone, who asked him to provide a check cashing service for certain contractors who had to pay cash to his boss, "Tony Boy" Boiardo. In return for this service, Kantor would receive 5% of the face value of all checks cashed. Kantor agreed and obtained Biancone's agreement to an arrangement whereby Kantor woud set up a "dummy" company (Kantor Supply), which would submit phony invoices to the victim contractors who, in turn, would remit checks to Kantor Supply. Thereafter, 95% of the face value of the checks would be delivered, in cash, to Biancone.

The Kantor Supply account was used to process the payments on the Southside project. Through it passed checks from the joint venturers and from Gallo companies aggregating $9,698,880.98, out of which Biancone received cash of $911,445.00.

## B. *The Southerly Extension*

In May 1965 a few months after he began work on the Southside project, Rigo was enlisted by the City to begin plans for a "Southerly Extension of Newark's water supply," which was urgently needed to alleviate a critical water shortage. At a June 1965 meeting at City Hall attended by Addonizio, LaMorte, Rigo, and Corporation Counsel Norman Schiff, Rigo informed the Mayor that Gallo did not make the sort of high pressure pipe required for the project, and that the contract would have to go to Interpace (Lock Joint). In that case, the Mayor said "Tony Boy better figure out a way to get something out of Lock Joint." Corporation Counsel Schiff asked "Will he get enough?" The Mayor replied, "If he goes after it, he'll get enough."

Shortly thereafter, in a meeting with Charles Albertson, an Interpace vice-president, Biancone said that Interpace could participate in the Southerly Extension only if it agreed to pay a 10% kickback. Albertson refused. A few weeks later, with Albertson out of town,

Biancone met with Interpace's Gillespie and again tried to extract an unspecified figure. Gillespie made no commitment, but informed Albertson of the meeting upon his return and told him to call Biancone. Albertson called Biancone, met him the following day, and finally agreed to a payment of 5%, or $35,000.00.

Albertson recognized that his company was the logical supplier. Time was of the essence and Interpace had two factories in the vicinity of the job site, one in New Jersey and the other in Maryland. Notwithstanding his belief that his company might have been able to obtain the contract despite Biancone, Albertson testified that with the obvious control that Mr. Biancone and his group had over the specifications and the inspectors on the job, he was fearful that if his company took the job, they would be harassed with delays, rejection of product and such, that their cost would probably far exceed the $35,000 he agreed to pay. He also testified that he was aware of how his company had been "closed out" of the Southside Sewer project; that although he did not want to pay this money, he did so because of a degree of fear for his personal and family safety, and fear for his corporation.

By July 1965 Rigo began to feel the burden of making the 10% payments on the Southside project while working at the same time without contract or pay on the Southerly Extension. He spoke to both Mayor Addonizio and LaMorte, but to no avail. The Mayor informed him that any contract on the Southerly Extension would have to be cleared by Boiardo.[4]

Rigo was later driven to Boiardo's home by LaMorte. Boiardo's response to Rigo's protestations was: "You pay your ten percent or I'll break both your legs."[5] Rigo was also informed that the time might come when he would be called upon to collect the payments from the contractors as well. Soon thereafter, Rigo received a contract on the Southerly Extension and began receiving payments thereunder. He remitted 10% of these payments periodically to Boiardo through the conduit of appellant Vicaro.

The bids for construction of the Southerly Extension were taken in August 1965. The low bidder, however, was Verona Construction Company, the firm which had refused to go along on the Southside project. All bids were promptly rejected. The project was thereupon rebid. When the new bids were opened, Verona was again the low bidder, and it was awarded the contract. Subsequently, however, Verona President Cestone capitulated in the face of the City's withholding of progress payments and agreed to pay $100,000 in kickbacks. These payments were made through Rigo, who had been ordered by Boiardo to act as a go-between. Rigo also served as a conduit for the $35,000 in kickbacks made by Interpace.

In late 1967, LaMorte informed Rigo that there was "some kind of sensitive situation"[6] which prevented Boiardo from making his regular distributions to the Mayor and other city officials. LaMorte told Rigo that Boiardo therefore wanted Rigo to make these payments directly to these officials, that the price was $10,000 to each of eight councilmen and the Mayor. LaMorte indicated that he felt he was entitled to $25,000, and that Rigo should also give something to Mr. Schiff. Finally, he said that all

---

4. During the same conversation with the Mayor, Rigo asked him why he had ever left Congress to come into "this mess." Addonizio replied, "Simple. There's no money in Washington, but you can make a million bucks as the Mayor of Newark."

5. Boiardo's threats were economic as well. Later, in 1968, when he learned that Rigo was prospecting for work outside of New Jersey, he informed Rigo that "regardless of where [Rigo] obtained work he would expect his percentage."

6. About this time, the Governor's Select Commission in Civil Disorder, appointed to study the causes of the 1967 riots in the City of Newark, was taking evidence. As noted in appellant Addonizio's brief, the Commission issued a report in February 1968 in which it referred to a "pervasive feeling of corruption" in the Newark City Administration.

these payments would be deducted from the 10% that was being collected by Vicaro. Rigo made direct payments pursuant to this arrangement throughout 1968. The termination of the payments coincided roughly with the initiation of an Essex County Grand Jury investigation into certain financial dealings between Rigo and the Mayor.

## II.

### THE INDICTMENT

Count I of the indictment charges that the defendants:

did wilfully, unlawfully and feloniously conspire with each other, and with other persons to the grand jury unknown, to obstruct, delay, and affect interstate commerce, as that term is defined in Section 1951 of Title 18, United States Code, and the movement of materials, equipment, supplies, and labor in such commerce by extortion, as extortion is defined in said section of the United States Code; that is to say, that the defendants did conspire to delay, to obstruct, to impede and to thwart construction undertaken on behalf of the City of Newark, the contractors performing such work and the timely and usual movement of supplies and materials needed to complete such projects, in order to obtain the property of contractors, engineers and others working on said municipal construction pursuant to said contracts, with the consent of such companies, their officers and their agents, said consent having been induced both by fear of financial injury and under color of official right.

In violation of Section 1951 of Title 18, United States Code.

Counts II through LXIV each charge a substantive offense corresponding to single payments made by Paul Rigo to

the conspirators "in furtherance of the plan and purpose to commit the offense charged in Count I. * * * " Of these sixty-three counts, II through X, which concern payments made to Boiardo's middlemen, do not name a specific recipient of the payoffs, but simply allege that the "defendants obtained" varying sums on stated dates from Constrad, Rigo's corporation. Counts XI through LXIV, on the other hand, correspond to the period during which Rigo was making payments directly to city officials. Those counts name not only the specific sums and dates, but also the conspirator to whom the payment was made.

### A. *Sufficiency*

Appellants claim that the indictment does not satisfy the test set forth in Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932):

"The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction'."

█ It is clear from a reading of the indictment that every count alleges the essential facts constituting the offense charged therein. Esperti v. United States, 406 F.2d 148 (5th Cir. 1969); Rule 7(c), Fed.R.Crim.P. If there be any defect in the indictment, therefore, it must be in its failure either to apprise the defendants of the charges against them or to protect them against double jeopardy.[7]

---

7. " * * * [An] indictment which charges a statutory crime by following substantially the language of the statute is amply sufficient, provided that its generality neither prejudices defendant in the preparation of his defense nor endangers his

constitutional guaranty against double jeopardy." United States v. Achtner, 144 F.2d 49, 51 (2nd Cir. 1944); United States v Palmiotti, 254 F.2d 491, 495 (2nd Cir. 1958).

In assessing the sufficiency of the conspiracy count, the *Hagner* test must be read in conjunction with the rule laid down in Wong Tai v. United States, 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927):

> "It is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, * * * or to state such object with the detail which would be required in an indictment for commiting the substantive offense. * * * In charging such a conspiracy 'certainty to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is necessary.' "

We are convinced from our own careful reading of Count I, which charges a specified continuing course of conduct over a particular five year period, that it more than meets the *Wong Tai* test and, as required by *Hagner*, both adequately apprised the defendants of the charges against them and protected them against any future double jeopardy.[8]

The sixty-three substantive counts allege payments of specific sums at specific times (fifty-four name the recipient as well), all in furtherance of the conspiracy. Since the conspiracy count is itself sufficient under Rule 7(c) and *Hagner*, it follows *a fortiori* that the substantive counts are sufficient as well.

### B. *Multiplicity*

Relying heavily on this court's decision in United States v. Provenzano, 334 F.2d 678 (3d Cir.), cert. den. 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964), appellants contend that the indictment in this case is multiplicious. In *Provenzano* the Government proceeded on a single-count indictment, on the theory that the series of payments over a number of years was the result of a "single and unified" extortionate scheme. The defendant argued that each payment should have been alleged in a separate count. In upholding defendant's conviction, Judge Biggs (then Chief Judge), speaking for the court, held only that the Government *may* legally proceed on a one-count theory. *Provenzano* does not stand for the proposition urged by the appellants, namely, that the Government *must* proceed on such a theory.

Indeed, such a holding, on the facts of this case, would ignore the reality of the situation. We think the evidence clearly shows that each of the payments charged in the substantive counts manifested all the elements of the crime of extortion as defined in the Hobbs Act. The statute requires only (1) that the defendants induce their victims to part with property, (2) that they do so through the use of fear, and (3) that, in so doing, they adversely affect interstate commerce. The evidence is clear that Rigo parted with his property on each of the sixty-three alleged occasions.[9] We think the evidence is equally clear that on each occasion he was motivated to do so by fear of economic injury to himself and his companies. Rigo testified explicitly and at length about his fears concerning the possibility of delay in his obtaining progress payments and the difficulties he would have experienced acquiring other work, both in and out of the Newark area, if he did not continue delivering the payoffs. The jury could certainly find that this continuing element of fear was the impetus

8. Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), relied on heavily by appellants, is of no help to them. To the extent the holding in *Russell* rests on the failure of the indictment to allege an essential element of the offense, it is inapposite, since here all the elements were charged. To the extent *Russell* relies on the failure of the indict-ment adequately to apprise the defendant of the charges against him, it is distinguishable, since the indictment in this case possesses none of the "cryptic" qualities found in *Russell*. *See* Vandersee v. United States, 321 F.2d 57 (3rd Cir. 1963).

9. As to the disputed counts III, VII and IX, see the discussion of duplicity, *infra*.

behind each of the payments made. It was not necessary for the Government to prove a separate extortionate demand for each count. United States v. Tolub, 309 F.2d 286 (2d Cir. 1962). Finally, the Hobbs Act prohibits extortion which affects commerce *"in any way or degree."* It is a reasonable inference (which the jury was entitled to draw) that each individual payment from Constrad to the conspirators, to the extent that it depleted the resources of an interstate company and affected its ability to function, affected interstate commerce to some degree and therefore constituted a separate, independent violation of the Hobbs Act. United States v. Provenzano, supra, 334 F.2d at 693.

Since each count charged, and the evidence proved, a distinct violation of the Act, the indictment was not multiplicitous.

### C. *Duplicity*

■ Appellants attack count I on the ground that it "is so broad in its scope—including the period of time involved—that the indictment is duplicitous." Assuming appellants' objection goes to the fact that the count alleges a conspiracy to commit several substantive offenses rather than one, the law in this circuit is squarely against them. "[T]he conspiracy is the gist of the offense, and though the count charges an agreement to commit several crimes * * *, each one of which may be the basis for an indictment, the count charges but one offense under 18 U.S.C. § 371." United States v. Knox Coal Co., 347 F.2d 33, 39 (3d Cir.), cert. den. Lippi v. United States, 382 U.S. 904, 86 S.Ct. 239, 15 L. Ed.2d 157 (1965); Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L. Ed. 561 (1919).

Appellants advance only a slightly more substantial argument as to counts III, VII and IX, which charged extortions from Constrad, Inc., of $37,000, $20,000, and $20,000 respectively. The proof at trial revealed that only a frac-

tion of the money paid on each of these three occasions actually belonged to Constrad; the balances constituted payments from Cestone, which were merely being funneled *through* Constrad.[10] Appellants therefore argue that, while these three counts may not have been duplicitous on their face, they were *in fact* duplicitous in that they each implicitly charged two crimes.

■ The argument is specious. The real thrust of this argument is that the Cestone payments were irrelevant to the charge in counts III, VII and IX. However, as to all three counts, the Government proved all the elements of a Hobbs Act violation as to Constrad, the proof varying from the indictment only as to the amount extorted. Since the evidence as to the Cestone money was admissible to prove the conspiracy count at any rate, we are of the opinion that the discrepancy between indictment and proof on these three counts constituted merely a nonprejudicial variance which does not warrant reversal.

Appellants' other arguments as to duplicity are also without merit.

### III.

### PRE-TRIAL MOTIONS

### A. *Failure to Grant a Continuance and Retransfer*

As one might expect, a not insubstantial amount of pre-trial publicity accompanied the unfolding of this case, concentrated largely in the areas around Newark. Appellants assert that the trial court, through a number of its rulings, failed to adequately shield the trial from the effects of that publicity.

Appellants Biancone and Vicaro along with co-defendant Boiardo, made pre-trial motions for a change of venue to another district pursuant to Fed.R.Crim. P. 21(a), coupled with a request for a continuance of six months. Alternatively, they sought a continuance of one year with the trial to be held within the

10. Of the $37,000 alleged in Count III, $30,000 was Cestone's. Similarly, $10,-000 involved in Count VII and $10,000 involved in Count IX was Cestone's.

District of New Jersey. While acknowledging that the volume of pre-trial publicity was "both extensive and intensive," the court denied these motions,[11] stating that:

> To presume, in advance of the voir dire examination of the prospective trial jurors, that the extent of the pre-trial publicity in this case negates the selection of a fair and impartial jury represents a premature and unwarranted supposition. This court is satisfied that a properly conducted voir dire will adequately protect the rights of these defendants to a fair trial. * * * If the voir dire disproves this assumption, the relief requested could then be reconsidered.

United States v. Addonizio, 313 F. Supp. 486, 493–494 (D.N.J.1970).

The court did, however, transfer the proceedings from Newark to Trenton, observing that:

> in view of the concentration of public interest and news coverage in the Newark area, the court is convinced that the jury selection process will be facilitated by the transfer of these proceedings from the Newark to the Trenton vicinage of the district, and that such a transfer will not unduly burden or inconvenience either the defendants or the witnesses.

*Id.*, at 494.

Shortly thereafter, all defendants moved for a retransfer of the proceedings to the Newark vicinage on the ground that the daily trip to Trenton would work an undue hardship on the defendants, counsel, and witnesses. The court denied this motion as well because it concluded that the degree of inconvenience was clearly outweighed by "the probability that the jury process selection here in Trenton will be substantially facilitated."

The court continued to deny repeated motions for a continuance throughout the voir dire.

▆▆▆ We find no error in any of these rulings.[12] The grant or denial of a continuance is a matter within the discretion of the trial judge, and an abuse of that discretion will not be found unless a denial of a continuance is "so arbitrary as to violate due process" under the circumstances. Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed. 2d 921 (1964). *See* United States v. Greenberg, 419 F.2d 808 (3d Cir. 1969). Here there was no abuse of the trial court's discretion. Its denial of a continuance was conditioned on the court's ability to select an impartial jury panel. Since we hold infra that the voir dire examination of prospective jurors was adequate and that the jury ultimately selected was impartial, there is no basis for finding an abuse of discretion in the denial of a continuance. Two additional factors have influenced our decision: First, as already noted, the trial court transferred the proceedings to the Trenton vicinage, where it was felt that the effects of pretrial publicity would be minimized; and second, the trial court was informed *in camera* by the Government that Irving Kantor, one of the chief prosecution witnesses, was in a terminal condition and could expire at any time.

▆▆▆ The appellants' contention that the trial court's transfer of the proceedings to Trenton violated Rule 18, Fed.R. Crim.P., and Rule 11a of the Local Rules of the District of New Jersey is frivolous. Rule 18 provides that the "court shall fix the place of trial *within the district* with due regard to the convenience of the defendant and the witnesses." (Emphasis supplied) The trial court's rulings, quoted above, disclose an ample regard for the convenience of the defendants. The court's determination

---

11. A later motion by Addonizio for a continuance was also denied by the court.

12. Appellants do not challenge the trial court's denial of a change of venue, perhaps because such a challenge would be manifestly inconsistent with their attack upon the court's refusal to retransfer the proceedings to Newark.

that, on balance, other factors outweighed the consideration of convenience does not evince a lack of "due regard" therefor. The court's ruling was therefore a proper exercise of the discretion conferred by Rule 18.

■ Local Rule 11a vests in the District Court Clerk the function of assigning cases to Camden, Newark, or Trenton, and provides that in doing so he shall "take into consideration the residence of the defendant, the convenience of litigants, counsel and witnesses, and the place where the cause of action arose." Appellants argue that once this case was assigned to Newark, the trial court was without power to overrule the considered judgment of the Clerk. The appellants ignore the last sentence of Rule 11, subd. a, which makes it clear that the trial court has such power:

> The place so fixed shall be the place of trial and of all proceedings in the cause, *unless changed by order of the court.* (Emphasis supplied)

## B. *The Motions for Severance*

Appellant Addonizio originally made a pretrial motion requesting severance from all his co-defendants. Upon oral argument, the motion was modified to request severance only from those defendants who were not public officials—i. e., the "Boiardo Group," Boiardo, Vicaro, and Biancone—and from defendant Phillip Gordon, who was known by the defendants to have admitted receiving illicit payments from Paul Rigo. The motion was denied, as were other severance motions made by Addonizio throughout the course of the trial.

■ Addonizio contends that it was error not to sever him from "Boiardo Group" members Vicaro and Biancone[13] for two reasons. First, he contends that he was deprived of the benefits of pre-trial discovery because the inclusion of allegedly "underworld" defendants in the trial led the Government to shield the identity of prospective witnesses in order to protect them from threats, intimidation, and possibly physical harm. There is no merit in this argument, however, since in no event is the Government required to divulge the identity of its witnesses in a noncapital case. United States v. Persico, 425 F.2d 1375 (2d Cir. 1970); 18 U.S.C. § 3432. Even if Addonizio had been severed, therefore, he would not have been legally entitled to a list of witnesses.

Second, Addonizio contends that failure to grant him a severance, at least after he had testified, deprived him of his right to argue to the jury in closing that, while he had freely taken the stand and denied his guilt, his co-defendants had failed to do so. Addonizio cites DeLuna v. United States, 308 F.2d 140 (5th Cir. 1962), which clearly supports his position that a severance was required. However, we share the concern expressed by Circuit Judge Bell in his concurrence in *DeLuna*. Discussing the right of the co-defendant Gomez' right to comment upon DeLuna's failure to take the stand, Judge Bell stated:

> * * * If Gomez, or others similarly situated, claims the right which the majority holds that he has to comment on the failure of de Luna to testify, a mistrial will be required at the instance of his co-defendant who did not take the stand. In addition, severance in advance of trial may be required where there is a representation to the court that one co-defendant does not expect to take the stand while another or others do expect to testify, and claim their right to comment upon the failure of the other to testify. This would eliminate joint trials, or vest in a defendant the right to a mistrial during final arguments, or in the alternative create built-in reversible error, all in the discretion of the defendants.

De Luna at 156

Judge Bell concluded that a defendant has no right to comment upon a co-defendant's failure to take the stand. We hesitate to go so far. Rather, we believe the better rule was stated by Chief

---

13. As noted in footnote 1, supra, Boiardo himself was severed during trial due to illness.

Judge Hastings in United States v. Kahn, 381 F.2d 824, 840 (7th Cir. 1967):

> The question as we see it is *how essential is it to a fair and complete defense, an attribute of a fair trial, that defendants be permitted to comment upon a co-defendant's exercise of his right against self-incrimination.* The procedural difficulties and the complication of joint trials arising from the rule suggested by dicta in De Luna are so great that we cannot say there is an absolute right, without reference to the circumstances of defense at trial, for a defendant to comment on the refusal of a co-defendant to testify. We think there must be more to justify the disintegration of a trial, such as a conspiracy trial, in which there is a cohesion of crime alleged, defendants charged, and proof adduced. *There must be a showing that real prejudice will result from the defendant's inability to comment.* (Emphasis supplied)

The court further observed that, while there was some inconsistency between the defenses at trial, "the degree of antagonism * * * [was] not as great as that in *DeLuna* where the defenses were mutually exclusive." The court therefore held that, since the testimony "did not present the jury the dilemma of mutually exclusive defenses, with no evidentiary basis for judgment between them, in which a comment on the failure to testify would indicate which horn of the dilemma should be seized * * *," the defendants in question suffered no prejudice from their inability to comment upon their co-defendant's failure to testify. *Kahn*, at 841.

■ Here likewise, there was no mutual exclusivity among the defenses, i. e., nothing to indicate that "if one defense were believed, the other[s] could not be." *Kahn*, at 841. Nor were there any other prejudicial circumstances which would have justified the disintegration of a conspiracy trial of this magnitude. We therefore conclude that Addonizio's right

to a fair trial was fully protected when the trial court, although denying his motion for severance, allowed him to comment at length in closing argument upon his own willingness to testify, but not upon his co-defendants' failure to do so.

#### C. Bill of Particulars

In their pre-trial motions for bills of particulars, the appellants made hundreds of requests for information concerning the Government's case. The trial court denied the great majority of requests, but did order the Government to

> promptly file and serve a Bill of Particulars of the Indictment herein, particularly setting forth:
>
> *With respect to Counts II through X, inclusive:*
>
> The names of those Defendants, or other persons, through whom the Government alleges the Defendants obtained the sums of money from Constrad, Inc. * * *
>
> *With respect to Counts I through LXVI, inclusive:*
>
> A more specific factual statement with regard to the charges contained in the Indictment that the consent of the alleged victims of the charged extortions was "induced both by fear of—or by the wrongful use of fear of—financial injury and under color of official right." [14]

The Government complied with this order and, in addition, provided the defendants with copies of over 900 exhibits in advance of trial, pursuant to a separate discovery order.

In this court, the appellants complain mainly of the trial court's failure to grant those Count I particulars concerning what construction contracts were involved, who the victims of the alleged extortions were, and when the alleged conspiratorial acts took place.

■ "The purpose of the bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to

---

14. The trial court submitted the case to the jury only on the "fear of financial injury" theory.

avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." United States v. Tucker, 262 F.Supp. 305, 308 (S.D.N.Y.1966). A bill of particulars should fulfill this function "when the indictment itself is too vague and indefinite for such purposes." United States v. Haskins, 345 F.2d 111, 114 (6th Cir. 1965). *Accord,* Wyatt v. United States, 388 F.2d 395, 397 (10th Cir. 1968).

The 1966 amendment to Rule 7(f), Fed.R.Crim.P., eliminating the requirement that cause be shown before a bill of particulars may be ordered, is "designed to encourage a more liberal attitude by the courts towards bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases." Notes of Advisory Committee on Rules, 18 U.S.C. Rule 7(f). The net result of the change seems to have been to increase the instances in which particulars are granted, thus contributing to a desirable decline in the "sporting theory" of criminal justice.[15] United States v. Jaskiewicz, 278 F.Supp. 525 (E.D.Pa. 1968).

This liberalization has, out of practical necessity, been limited in some important respects, however. It is still firmly established, for example, that a defendant is entitled neither to a wholesale discovery of the Government's evidence, United States v. Birrell, 263 F. Supp. 113, (S.D.N.Y.1967), nor to a list of the Government's prospective witnesses, United States v. Jaskiewicz, supra; United States v. Palmisano, 273 F.Supp. 750 (E.D.Pa.1967).[16] In the final analysis then, the granting of a bill of particulars remains a discretionary matter with the trial court, and it is still "obviously a matter of degree how far an ac-

cused must be advised in advance of the details of the evidence that will be produced against him, and no definite rules are possible." United States v. Russo, 260 F.2d 849, 850 (2nd Cir. 1958). The denial of a motion for a bill of particulars does not amount to an abuse of discretion unless the deprivation of the information sought leads to the defendant's inability to adequately prepare his case, to avoid surprise at trial, or to avoid the later risk of double jeopardy.

We are unable to say that there has been an abuse of discretion on the facts of this case. From the face of the indictment, the defendants were aware (1) that the Southside and Southerly Extension projects were two of the construction jobs connected to the conspiracy, and (2) that Constrad was one of the alleged victims of the extortion. From the bill of particulars, the defendants were aware of the nature of the threats allegedly made to the victims. From the exhibits delivered by the Government before trial, they knew of the involvement of Rigo, the Killam firm, Irving Kantor and his "Supply" company, the joint venturers on the Southside project, and Verona Construction Company. It is true that the Government did not, at the pre-trial stage, weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendants, nor were they required to do so. United States v. Louis Carreau, Inc., 42 F.R.D. 408, 411 (S.D.N.Y.1967). Nor were the defendants made aware of every detail of the Government's case, most significantly, perhaps, the pressure to revise the specifications to permit the use of rubber and concrete joints on the Southside project. We are unable to say, however, that the defendants were left so uninformed that they were prevented from

---

15. *See* Brennan, "The Criminal Prosecution: Sporting Event or Quest for Truth," 1963 Wash.U.L.Q. 279.

16. Where, however, a defendant seeks legitimate information, he may not be denied it merely because the *effect* of providing

it is to divulge the names of government witnesses or the details of the government's evidence. United States v. Lipshitz, 150 F.Supp. 321 (E.D.N.Y.1957); United States v. Smith, 16 F.R.D. 372 (W.D.Mo.1954).

adequately preparing for trial.[17] Indeed, apart from their general protestation of surprise, appellants have pointed to no single instance in which they were prejudiced by lack of information. Lacking a showing of prejudice, we can find no abuse of discretion. United States v. Kafes, 214 F.2d 887 (3rd Cir. 1954); cf., United States v. Fioravanti, 412 F.2d 407 (3rd Cir. 1969).

## IV.

### THE JURY SELECTION

The voir dire examination of prospective jurors was conducted exclusively by the trial judge. Counsel were not permitted to participate, although they submitted proposed questions, many of which were asked by the court. The preponderance of the voir dire was devoted to determining the extent of each prospective juror's exposure to pretrial publicity and the effect of that exposure upon his ability to judge the defendants impartially. Invariably, any prospective juror who indicated he knew something about the case was questioned further as to the nature and extent of his exposure, while at the same time being admonished not to go into the *substance* of what he had read. Typically the inquiry centered around the particular newspapers in which the prospective juror had seen case-related stories and whether he had read entire articles or only portions thereof (or, in some instances, merely headlines). Prospective jurors were then questioned at some length as to whether they had formed any opinion as to the guilt or innocence of the defendants and whether they could judge the defendants impartially despite some exposure to pretrial publicity.

With one exception,[18] the appellants do not challenge the final composition of the jury. Rather, they challenge the method of examining the prospective jurors on voir dire. More specifically, they argue that:

(a) Counsel should have been allowed to examine the prospective jurors; and that (b) The court erred in not examining each prospective juror individually, out of the presence of the rest of the panel, as to the *content* of the articles which he had read concerning the case.

 As to participation of counsel, the court's ruling was clearly in conformity with Rule 24(a), Fed.R.Crim. P.,[19] and with the practice which apparently is followed in most federal trial courts.[20] There are no circumstances in this case which might render this rul-

---

17. In this connection, notice may be taken of the *in camera* observation of defendant Boiardo's counsel, after three weeks of Government testimony, that "there hasn't been a surprise yet in the Government's case because in preparing our defense, we knew who all the witnesses were. * * * [I]n the process of the last three months of investigating and talking to people everywhere we could, we obviously came upon the names of the various companies that were involved in the case."

18. The court rejected a challenge for cause of juror Mary Opsuth. In response to the court's inquiry as to whether she knew of any reason why she should not serve, Miss Opsuth responded, "No, I'm scared, that's all." Although appellants object to a juror who was "scared," it is clear from her subsequent response ("Well, I guess after you sit and listen to it you kind of get used to it") that she was merely referring to the sort of nervousness with which many novice jurors are quite naturally afflicted. Indeed, she testified specifically that her being "excited or scared" would not affect her ability to deliberate and be fair.

19. "The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

20. The Jury System in the Federal Courts, Report of the Judicial Conference Committee on the Operation of the Jury System, 26 F.R.D. 409, 466 (1960).

ing an abuse of discretion,[21] and we find no error therein. Nor did the court abuse its discretion in its choice of questions submitted by counsel.

In support of their assertion that the trial court should have inquired into the contents of the articles read by each prospective juror rather than relying upon the juror's own protestation of impartiality, appellants rely heavily on three cases. In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the petitioner was convicted of murder and sentenced to death in a trial in a small Indiana town which was preceded by virulent and inflammatory publicity. Nearly 90% of the veniremen examined admitted to having formed an opinion adverse to the petitioner. Eight of the twelve jurors who returned the verdict were among that 90%. They had been allowed to serve, however, because they had declared that they would be able to set aside those opinions and decide the case impartially on the basis of the evidence presented in court. The Supreme Court held that petitioner had been convicted in violation of his constitutional right to be tried before an impartial jury. Speaking of the eight jurors with preconceived opinions, Justice Clark stated:

> The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man. * * * No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.

366 U.S., at 727–728, 81 S.Ct., at 1645

Similarly, in United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2nd Cir. en banc, 1963), eight of the sixteen jurors and alternates had formed opinions of guilt before trial. In granting the writ, the court of appeals observed that asking the jurors if they could be impartial "placed on those individuals a burden we think impossible to be borne, in light of the nature of the publicity, the high proportion of jurors holding opinions of guilt, the length of time the opinions had been held and their persistence." [22]

In Silverthorne v. United States, 400 F.2d 627 (9th Cir. 1968), every juror had some knowledge of the case. Nearly 30% of the veniremen questioned expressed opinions of the defendant's guilt. There had been voluminous pretrial publicity. The court of appeals held that, under those circumstances, the trial court should have made some "effort to ascertain *what* information the jurors had accumulated," rather than relying on the jurors' own subjective assessment of the effect of that information upon their ability to remain impartial.

On its facts, however, the instant case differs significantly from each of the foregoing cases. Unlike *Irvin* and *Bloeth*, the publicity here was neither virulent nor inflammatory,[23] and no empanelled juror admitted having formed an opinion about the case. Unlike *Silverthorne*, the voir dire was neither cursory nor erratic. On the contary, the trial court here carefully and painstakingly assured itself that the jurors selected were impartial and unbiased by any exposure to the publicity or other influences. Prospective jurors who had formed an opinion as to guilt or innocence of any of the defendants were excused *sua*

21. *Cf.*, Silverthorne v. United States, 400 F.2d 627, 640 (9th Cir. 1968).

22. 313 F.2d at 372. The pretrial publicity labelled the defendant as the "Mad Killer" who had terrorized the community by committing three senseless murders; his confession was published in the papers, along with the District Attorney's opinion that he had to "get the chair"; and the newspapers intimated that, were the defendant

found not guilty by reason of insanity, he "would be free—perhaps to kill again."

23. Counsel for appellant Addonizio admitted as much before the district court:
 "There was no yellow press, no improper press. I don't think there has been any yellow press.
 * * * [I]t has been perfectly plain, good reporting all the way right up until now * * *"

*sponte* by the court. Prospective jurors who had discussed the case were similarly excused, regardless of the nature or extent of the discussion or their own expression of impartiality. The court dismissed on its own motion each prospective juror who indicated extensive exposure to pretrial publicity, *without regard* to protestations of impartiality. As a result, of the twelve jurors who eventually returned the verdicts, three had read nothing at all about the case, six had read "only headlines" or only "vaguely" recalled having skimmed articles, and three had read articles only "infrequently." In addition, several professed a lack of interest in the case, since the alleged acts of public misconduct had taken place in another part of the state. In sum, we are convinced upon review of the record that appellants were tried by an impartial jury and that there is no merit to their claim of constitutional infirmity either in the degree of pretrial publicity or in the court's ruling concerning the conduct of the voir dire. Beck v. Washington, 369 U.S. 541, 556, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).

 We feel impelled to add, however, that we find much merit in the method of voir dire recommended in the American Bar Association's Standards Relating to Fair Trial and Free Press, § 3.4(a) (Approved Draft, March 1968). As an exercise of our supervisory powers over the district courts in this circuit, therefore, we recommend that in cases hereafter in which there is, in the opinion of the court

a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. \* \* \* The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial. \* \* \*

Standards, § 3.4(a).

## V.

## THE EVIDENTIARY RULINGS

### A. *The Kantor Account*

Appellants question both the manner in which Irving Kantor's testimony was taken and the ultimate admissibility thereof.

### 1. *The Taking of Testimony*

After denying appellants' motion, pursuant to Rule 15, F.R.Crim.P.,[24] to have Kantor's testimony taken by deposition, the court, upon motion of the United States and pursuant to 28 U.S.C. § 141,[25] directed a special session of the court to be convened at the Veterans' Hospital in East Orange for the purpose of determining whether Kantor was competent to testify and, if so, for the taking of his testimony before the jury.

 We find no error in these rulings of the court. Section 141 clearly provides authority for the action taken. United States v. Tomaiolo, 249 F.2d 683 (2nd Cir. 1957). While such a course "should be followed only in cases of real emergency," *Id.*, at 694, we have no doubt from the record that such an emergency here existed. Kantor had by this time become completely immobilized and his death was thought to be imminent.

---

24. Rule 15 provides, in part:
 "(a) \* \* \* If it appears that a prospective witness may be unable to attend or prevented ·from attending a trial or hearing, that his testimony is material and that it is necessary to take his deposition in order to prevent a failure of justice, the court at any time after the filing of an indictment or information may upon motion of a defendant and notice to the parties order that his testimony be taken by deposition. \* \* \* "

25. "Special sessions of the district court may be held at such places in the district as the nature of the business may require, and upon such notice as the court orders.
 "Any business may be transacted at a special session which might be transacted at a regular session."

It was certainly well within the sound discretion of the court to order his testimony taken at the commencement of trial and at the only practicable location, the hospital in which he was confined. It was a valid exercise of the court's discretionary power to secure Kantor's actual attendance at trial by convening a special session at the hospital.

■ We likewise find no merit in appellants' complaint over the court's refusal to permit physicians chosen by the defense to examine Kantor in order to determine his competency to testify. The court had before it both the opinion of Kantor's physician, Dr. Leonard Granick, that Kantor's "understanding and perception are normal," and Kantor's hospital chart, which indicated that he "appears to be well oriented, in good contact with his environment, and shows no impairment of memory." In addition, the court examined Kantor personally and at length. The court's conclusion that Kantor was competent to testify is amply supported both by these pre-testimonial indices and by Kantor's testimony itself. His testimony clearly indicates that he was in complete control of his faculties of comprehension and communication.

■ There was no error in the court's use of Mrs. Kantor as an "interpreter" during her husband's testimony. Kantor was unable to speak above a loud mumble and apparently had difficulty making himself understood at times. According to Dr. Granick, however, Mrs. Kantor's constant attendance at her husband's bedside during the period of his deterioration instilled in her the ability to understand his words almost without hesitation. It was Dr. Granick's opinion that Mrs. Kantor "could act very well as an interpreter." For this reason, the court, after examining Mrs. Kantor thoroughly as to her ability to translate accurately and any possible motives she might have to distort her husband's testimony, allowed her to act as the conduit through which her husband's words were relayed to the jury. We find this

procedure to have been a sound exercise of the court's discretion in "appoint[ing] an interpreter of its own selection. * * * *" F.R.Crim.P., Rule 28(b).

2. *The Admissibility of the Kantor Testimony*

■ Appellants challenge the admissibility of the Kantor testimony on several grounds. First, they argue that there was no evidence connecting the Kantor account to any defendants except Biancone (and Boiardo, whose case was severed), and that evidence of the existence of the account was inadmissible as to these defendants. This is a frivolous argument. Since, as we hold *infra,* there is ample evidence connecting each appellant to the conspiracy charged in Count I, and since there was testimony that Boiardo had mentioned the existence of a dummy account used to disguise payments made pursuant to the extortionate scheme, evidence of the existence of the Kantor account was admissible against all the conspirators despite the lack of proof directly connecting them therewith.

■ Appellants have also argued that, even assuming that evidence of the *existence* of the account was admissible, the further evidence of the nearly one million dollars in payments deposited therein, and subsequently withdrawn therefrom (minus five percent) by Biancone was inadmissible, since there was no evidence connecting these particular monies with the conspiracy charged in Count I.

It was the Government's theory at trial that the $928,665.67 in checks given to Kantor by Biancone in exchange for phony invoices was in fact the 10% payment extorted from the contractors and suppliers on the Southside project. The $911,445.00 in cash generated following Kantor's deduction of his 5%, the Government contends, constituted the sum of the payoffs which finally made their way into the hands of the conspirators.

Appellants first attack this hypothesis on the ground that the evidence is, in

several respects, inconsistent therewith. They point out that some of the phony invoices purported to be for supplies needed for projects totally unrelated to the Southside project. This, of course, is of no significance whatever. Since the invoices were fictitious anyway, it would not have mattered if *none* of the invoices related to the Southside project; they were merely a devious expedient.

Appellants also point out that several of the companies depositing checks in the Kantor account contributed amounts greatly at variance with the 10% mean figure.[26] This also is of no significance. It is quite possible, and the jury was certainly entitled to infer, that, as a matter of procedure agreed upon among themselves, certain of the companies were to be used to generate a disproportionate percentage of the payments, and that distribution of payments to those companies from the joint venture were therefore adjusted accordingly. The jury was entitled to infer that the percentage figure was negotiable and adjustable from time to time. (Such a procedure would have been closely analogous to that used in connection with the Southerly Extension project, in which Constrad served as a conduit for payoffs from Verona Construction Co. and Interpace.) Nor can we attach any significance to the fact that Mal-Bros., one of the joint venturers, paid more into the Kantor account than it received in periodic payments from the joint venture. The joint venture agreement provided that these periodic payments did not compose the entire ultimate distribution of profits from the project.

As a final alleged inconsistency, the appellants point out that, although payments to the joint venture from the city were completed in November 1966, three of the payments into the Kantor account were made in 1967 and 1968. The late dates of these payments were matters for the jury, however. The jury was entitled to infer, as appellants now urge, that these dates are inconsistent with the Government's theory that the payments were in connection with the Southside project. The jury was equally entitled to infer, however, that the companies involved had decided for one reason or another, or had been compelled by financial considerations (e. g., other pressing obligations or liquidity problems), to defer the final payments into the years immediately following the city's last installment. This court cannot, therefore, accept appellants' argument that *as a matter of law* these late payments were inconsistent with the Government's theory of the case.

In addition to these alleged inconsistencies, the appellants cite what they consider to have been a total lack of affirmative proof connecting the money flowing through the Kantor account with the Southside project. In the words of Biancone's counsel, "what the Government did was to put almost $1,000,000 into Biancone's hands without ever connecting that money to this case." Our examination of the record, however, reveals abundant evidence from which a jury could infer that the payments into the Kantor account *must* have been in connection with the Southside project. This evidence includes the following:

(1) Cestone's testimony regarding conversations with John Sepede (who, along with Gallo and Boiardo, had allegedly set up the Southside extortion scheme) in June and July of 1964, in which Sepede estimated the value of the Southside contract as "between 10 and 12 million" and the required kickback as one million. These estimates, repeated by Sepede at a meeting with Cestone in August 1964, are very close to the $9,-698,880.98 actually paid out by the city on the contract and the $911,445.00 which ultimately emerged from the Kantor account. This testimony alone, coupled with the fact that all payments into the Kantor account were made either by companies engaged in the Southside project or, in Gallo's case, by companies related by common ownership to other

---

26. See Government Exhibit No. G–1300, attached hereto as an appendix.

companies which were engaged in the project, was sufficient to support an inference connecting the Southside project to the Kantor payments. But this was not the only evidence.

(2) Cestone testified that, at their August 1964 meeting, Sepede informed him that, as far as making the required kickback was concerned, "unlike other suppliers Mr. Gallo would carry his own freight." This is consistent with the evidence that Gallo, of all the suppliers on the Southside project, was the only one to make payments into the Kantor account.

(3) Rigo's March 1965 conversation with Boiardo, following Sepede's death, makes it clear that 10% was being required of everyone who worked on the Southside project. Rigo related the conversation:

B. "This job you have done [down?] there on the South Side * * * that was set up by Johnny Sepede and me, and Johnny Sepede and I had an understanding and that understanding is that you paid 10% of what you get on that job."

R. "I can't pay you 10%."

B. "You will pay 10% and you will pay it in cash."

R. "We can't pay you 10%. What are we getting for paying you 10%?"

B. "There is a lot of mouths to feed in City Hall, you pay me the 10%. I take care of the Mayor and I take care of the Council I take care of anyone else that has to be taken care of down there * * * "

When Rigo said he couldn't pay with cash, Boiardo told him of the "plumbing supply company" that could generate cash for him through the use of phony vouchers. Since, as an engineering firm, Capen-Rigo could not even pretend to need plumbing supplies, Rigo decided to generate the cash instead through his other company, Constrad.

(4) All Salvatore checks introduced into evidence, including the $186,182.20 in payments into the Kantor account, were in fact drawn upon a special account in the name of the *joint venture* (C. Salvatore & Sons, Inc.—Southside Project), the only purpose of which was the construction of the Southside project.

All of appellants' allegations of error as to the Kantor account are therefore without merit.

## B. *The Gordon Transcript*

At trial, the Government introduced portions of the grand jury transcript containing testimony of defendant Gordon, who had been a councilman, and later corporation counsel, of the City of Newark. The gist of Gordon's testimony before the grand jury (he did not testify at trial) was that on each of two separate occasions he had personally accepted from Paul Rigo two unmarked brown envelopes, one of which he kept for himself and one of which he personally gave to the defendant Anthony Giuliano (who died before trial). On each occasion, in the envelope he kept for himself, Gordon found $2,000 in cash. He testified that Rigo had given him this money in connection with the "Water Authority jobs." Following admission of this testimony, the court instructed the jury to consider it only in connection with defendant Gordon and not in any way in connection with his codefendants.

Appellants attack the admission of this transcript on the basis of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). There, the Supreme Court held that a confession of a defendant who does not take the stand may not be introduced into evidence at their joint trial if it inculpates a codefendant, limiting instructions notwithstanding. Such a procedure, the Court ruled, violates the Sixth Amendment's confrontation clause. Although conceding that Gordon's testimony in no way implicates them directly, appellants have nonetheless argued that Gordon's testimony directly corroborated that of Rigo, who testified to the same transactions. This highly-believable corroborative testimony, they argue, had the effect of enhancing Rigo's credibility *generally*,

which in turn made it more likely that the jury would believe Rigo's testimony concerning his illegal dealings with the appellants themselves. Thus, the appellants conclude that the Gordon testimony did indeed prejudice them and, under *Bruton,* should not have been admitted into evidence.

■ *Bruton* is not apposite however. Unlike *Bruton,* Gordon's testimony before the grand jury referred only to Rigo in no way directly implicated the appellants. Its purpose was to prove Gordon's participation in the conspiracy and was accompanied by appropriate limiting instruction. To whatever limited extent it may have enhanced Rigo's credibility, its effect was greatly mitigated by extensive and relentless cross-examination which Rigo underwent over a period of several days. Under these circumstances, we hold that the Sixth Amendment rights of appellants were not violated. Cf., Posey v. United States, 416 F.2d 545, 550 (5th Cir.) cert. den'd. Snowden v. United States, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970), United States v. Lipowitz, 407 F.2d 597 (3d Cir.) cert. den'd. sub nom. Smith v. United States, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969).

### C. *The Co-Conspirators' Exception*

■■ There was much testimony as to statements made by various co-conspirators during the course, and in furtherance of the conspiracy. Since the court properly instructed the jury that these statements could not be considered against any defendant unless there was sufficient evidence *aliunde* connecting that defendant to the conspiracy, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), there was no error, under the traditional federal hearsay standards, in their admission into evidence. Appellants attack the traditional co-conspirators rule, however, on Sixth Amendment confrontation grounds. They argue that the "rationale" of the Supreme Court's decisions in Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), Douglas v.

Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); Bruton v. United States, supra, and California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) requires a holding that the co-conspirator's exception is violative of the confrontation clause. This court has rejected this argument in the past, United States v. American Radiator & Standard Corp., 433 F.2d 174 (3d Cir. 1970), Parness v. United States, 415 F.2d 346 (3d Cir. 1969), and we see no basis in policy or in the Supreme Court's recent decision in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), which causes us to accept it now. Nor do we believe that in the circumstances of this case, the admission of this evidence offends due process. Dutton v. Evans, supra (Harlan, J., concurring).

### D. *The Threats to Rigo*

Rigo testified that, in January 1969, when investigations were beginning into the situation in Newark, Vicaro warned him: "Stay away from the Pope (Addonizio). Keep your mouth shut and remember you have a pretty daughter in Suffern." Rigo said he "took it to be a threat against my daughter. * * *" In March 1969, prior to his testifying before the Essex County Grand Jury, Rigo found an anonymous note on the seat of his car which read "This could have been a bomb. Keep your mouth shut." This was followed by an anonymous phone call in August 1969 which warned him to "[k]eep the hell away from the Federal Building."

Appellants claim error in the admission of this testimony on two grounds: (1) there was no evidence connecting the author of the note or the maker of the call with the appellants or their alleged co-conspirators, and (2) the evidence as to all three threats was both irrelevant to the issues at trial and highly inflammatory in nature.

■ It is clear that the connection between a message (either oral or written) and its source may be established by circumstantial evidence. VII Wig-

more, on Evidence, § 2155(1) (b); United States v. Alper (Greenberg), 449 F.2d 1223 (3d Cir. 1971). As Judge Merrill observed in Carbo v. United States, 314 F.2d 718, 743 (9th Cir. 1963):

> The issue for the trial judge in determining whether the required foundation for the introduction of the evidence has been established is whether the proof is such that the jury, acting as reasonable men, could find its authorship as claimed by the proponent. The scope of appellate review upon this issue is confined to determining whether the admission constituted abuse of judicial discretion in determining that a prima facie case had been made out." (footnotes omitted)

The pattern of physical intimidation of Rigo by both Boiardo and Vicaro, coupled with "the manner in which the warning[s] so obviously fitted into the conspiracy scheme," could have led reasonable men to believe that the threats had been made "by or at the direction of one of the conspirators." [27]

■ Since the indictment was predicated on the "fear of economic injury" theory, appellants correctly point out that *physical* threats would clearly not be relevant to prove the extortionate nature of the conspiracy. They ignore, however, the crucial fact that the *conspiracy itself* continued up to the time of the indictment in December 1969, well after the threats were received. To the extent, therefore, that the threats constituted an effort to prevent an ongoing, profitable extortion conspiracy from being aborted—as distinguished from an attempt to conceal a conspiracy after its completion, Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949)—they were acts done in furtherance of the conspiracy's existence.

## VI.

## SUFFICIENCY OF THE EVIDENCE

It would serve no purpose to review in detail the evidence against each appellant. We are satisfied that there was sufficient evidence to convict each appellant on each of the sixty-four counts on which guilty verdicts were returned. Only two arguments relating to the sufficiency of the evidence require extended discussion.

### A. *As to Extortion*

■ Appellants contend that the only reasonable inference from the evidence was that bribery, and not extortion, was being committed. Therefore, they argue, there was a failure of proof as to the charges in the indictment.

■ "Extortion" is defined by the Hobbs Act as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The "fear" may be fear of economic loss as well as of physical harm. United States v. Sweeney, 262 F.2d 272 (3rd Cir. 1959); United States v. Stirone, 262 F.2d 571 (3rd Cir.), rev'd. on other grounds, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The Hobbs Act definitions of robbery and extortion are taken from New York law. United States v. Nedley, 255 F.2d 350 (3rd Cir. 1958). The definition of extortion at the time of the Hobbs Act's enactment was found in former New York Penal Law § 850, McKinney's Consol.Laws, c. 40. In interpreting § 850, the New York courts distinguished extortion from bribery. Thus, in Hornstein v. Paramount Pictures, 22 Misc.2d 996, 37 N.Y.S.2d 404 (1942), the court pointed out that while bribery was a voluntary payment made in order to exert undue influence upon the performance of an official duty, extortion involves payment in return for something *to which the payor is already legally entitled*. In other words, while the essence of bribery is voluntariness, the essence of extortion is duress. People v. Dioguardi, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960).

The appellants argue that, in order for extortion to have been made out here,

---

27. United States v. Carbo, supra, at 743.

the Government would have had to prove that the payments were induced by threatened interference with *then-existing* contract rights, e. g., threats to withhold payment for work already completed pursuant to a valid contract. Here, they assert, the alleged victims knew well in advance of their entering into municipal contracts that 10% was expected of those doing business with the city and agreed before the signing to pay their share. Thus, appellants conclude, the transactions constituted bribery, since the so-called victims were paying to acquire *future* contract rights rather than to protect contract rights which were already theirs.

◼ Even assuming the accuracy of the factual portion of appellants' argument,[28] the legal propositions set forth cannot be accepted. First, while the contractors' advance knowledge that a kickback would be required might give rise to a jury question as to whether the transactions were briberous or extortionate, we cannot agree that advance knowledge alone conclusively establishes bribery. It is entirely conceivable, and a jury would certainly be entitled to infer, that in a widespread and highly effective extortion conspiracy, potential victims would be aware of the illicit requirements placed upon contractors and would succumb in advance of the contracting to the pressure which they knew would be forthcoming.

The second, and related, problem with appellants' argument is in its implicit assumption that *contractual property* rights are the only rights with which there could have been interference. In fact, contractual rights comprise only a part of the "package" of rights which can form the basis of an extortion. Contractors, engineers, and suppliers, for example, have a right to expect that when they incur time and expense to bid on public projects, they will be awarded contracts when their bids are lowest, and that they will subsequently enjoy the full financial benefits of their efficiency and industry. The City of Newark had systematically destroyed this right. As Boiardo told Rigo, *"everybody* in Newark pays 10% *or they don't work* in Newark and they don't get paid in Newark."* (emphasis supplied) As a result, low bidders such as plumbing contractor Braun had their bids thrown out when they refused to participate in the kickback scheme. Ralph Cestone, who finally managed to have his low bid on the Southerly Extension accepted, was forced to pay kickbacks to keep from being financially harassed as the work progressed. Rigo testified that he paid, not to gain undue influence, but to protect his financial future in the face of threats from Boiardo. From this and other evidence, the jury was entitled to conclude both that the conspiracy was an extortionate one and that the sixty-three payments which formed the basis for the substantive counts were made by Rigo in response to extortionate demands. Therefore no failure of proof existed as to the extortionate nature of the crimes charged.

### B. *As to Vicaro's Knowledge*

Vicaro argues that the evidence failed to establish, even circumstantially, that he had knowledge that the payments being made were the products of coercion, duress, or fear of economic injury. Therefore, he continues, the evidence established only that he knew that "something illegal" was taking place—perhaps bribery, perhaps extortion, perhaps something else. On such scant knowledge, he contends, a defendant may not be convicted of knowing participation in either a conspiracy to commit, or the substantive crime of, extortion.

◼ We need not rule upon the Government's somewhat troublesome argument that Vicaro may not hide behind his "self-induced" ignorance, since we have concluded that a reasonable fact

---

28. We note, for example, that the Killam firm did *not* know of the "arrangement" when they first became involved in the Southside Project. Indeed, they withdrew as soon as they became aware of it.

finder could have found that Vicaro was in fact *not* ignorant of the extortionate nature of the conspiracy.

 The evidence as to Vicaro establishes that he was much more than a "mere delivery boy," as he characterizes himself. There is an abundance of evidence to connect him with the conspirators and the conspiracy. While, of course, a defendant may not be guilty "by reason of mere association," Nassif v. United States, 370 F.2d 147, 153 (8th Cir. 1966), the evidence as to Vicaro establishes a major vital role by him in the conspiracy, not a "mere association" with the co-conspirators. Not only had he been a close associate of Boiardo for many years, but it was Vicaro who had the crucial assignment and the highly sensitive responsibility of collecting enormous sums from Rigo. Vicaro concedes that Boiardo introduced him to Rigo and informed Rigo that thereafter Vicaro would pick up Rigo's payments. For over three years Vicaro alone made numerous collections of cash payments at odd times and under unusual circumstances. It was Vicaro who personally pressured Rigo with a series of "inquiries" as to when payments would be available. It was Vicaro who obviously carried with him the trust and confidence of the other coconspirators. When the Essex County Grand Jury investigation threatened to expose the conspiracy, it was Vicaro who warned Rigo to keep his mouth shut.

In view of the totality of these circumstances, there was sufficient evidence from which the jury could reasonably infer that Vicaro knew of the extortionate nature of the conspiracy. Since secrecy and concealment are essential features of a successful conspiracy, "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details. * * *"[29] We therefore hold that the evidence as to Vicaro was sufficient to support the verdict on all counts.

## VII.

### CHARGE TO THE JURY

#### A. *On Interstate Commerce*

The appellants attack the court's charge on the interstate commerce element of the conspiracy and extortion in two respects. First, as to the conspiracy count, they assert that the court allowed the jury to find the requisite effect on interstate commerce on the basis of theories not alleged in the indictment. Second, as to all counts, they assert that the court charged on theories of interstate commerce not contemplated by the Hobbs Act.

#### 1. *The Charge on the Conspiracy Count.*

The conspiracy count reads, in part, as follows:

1. That between January 1, 1965 and continuously thereafter until the very date of this indictment the City of Newark awarded contracts for municipal construction, all of which construction was and is dependent upon interstate commerce for materials, equipment, supplies and labor for completion.

2. That * * * [during the same period, the defendants conspired] to obstruct, delay, and affect interstate commerce * * * and the movement of materials, equipment, supplies and labor in such commerce by extortion * * *; that is to say, that the defendants did conspire to delay, to obstruct, to impede and to thwart construction undertaken on behalf of the City of Newark, the contractors performing such work and the timely and usual movement of supplies and materials needed to complete such projects * * * in order to extort monies from the contractors.

The court charged the jury that they could find the interstate element of the

29. Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed.2d 154 (1947).

crime if they believed that any of the following facts had been established:

(a) that the Southside project was designed to service firms and industries engaged in interstate commerce; or

(b) that the Verona Construction Company was, during the time in question, engaged in business in New Jersey and other states; or

(c) that the Southerly Extension was designed to provide water service to firms and industries engaged in interstate commerce; or

(d) that Interpace was engaged in business in New Jersey and other states; or

(e) that the Southerly Extension was dependent upon interstate commerce for materials and supplies for completion; or

(f) that Constrad was formed for the purpose of doing business both within and outside New Jersey, and did engage in business outside of that state; or

(g) that the Meadowlands project was designed to provide facilities for both light and heavy industry and to attract such industry by virtue of its location near rail lines and the Newark Airport; or

(h) that the purpose of the Dunkers Pond and Susquehanna Aqueduct projects was to furnish water to firms and businesses engaged in interstate commerce

and if they further believed that there was "a conspiracy which contemplated the extortion of monies from any of the firms * * * just mentioned, or from any firms working on these several municipal projects. * * *"

 In appellants' view, the only theory charged in count I was that municipal construction "was and is dependent upon interstate commerce for materials, equipment, supplies, and labor for completion." Therefore, appellants contend, except for (c) supra, the court's charge was predicated on theories of interstate commerce not alleged in the indictment, and thus violated the rule in Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).[30] We do not agree. · In Stirone the trial court charged the jury that they could find the interstate commerce element if they believed either (1) that sand had been shipped in interstate commerce to the victim's plant, or (2) that the victim's "concrete was used for constructing a mill which would manufacture articles of steel to be shipped in interstate commerce. * * *" 361 U.S. at 214, 80 S.Ct. at 272. The Supreme Court reversed, holding that in allowing the jury to consider the latter theory, the trial judge had effectively amended the indictment, and thereby "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury."[31] 361 U.S. at 217, 80 S.Ct. at 273.

Such variance between indictment and charge does not exist in this case. Every theory of interstate commerce on which the court charged was fairly and adequately set out in count I.

Appellants ignore that part of count I which charges interference with "[1] construction undertaken on behalf of the City of Newark, [2] the contractors performing such work and [3] the timely and usual movement of supplies and materials needed to complete such projects. * * *" While count I makes explicit reference to interstate commerce only with respect to the last of these effects, it is clear from the indictment read as a whole[32] that, in fact, it charges that *all*

---

30. Appellants did not raise this objection below. ·However, under Fed.R.Crim.P. 52 (b), a *Stirone* error is plain error and may therefore be raised for the first time on appeal. United States v. Roach, 321 F.2d 1 (3d Cir. 1963).

31. See Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887).

32. The substantive counts (II–LXIV) all charge offenses allegedly committed "in furtherance of the plan and purpose to commit the offense charged in Count I. * * *" An effect of one of the substantive offenses would therefore also be an effect of the conspiracy itself. We may therefore look to the substantive counts

*three* effects interfered with interstate commerce.

### (i) *Construction of projects*

Counts II through IX each recited (a) that the Southside project was designed to transmit sewage from the place of business of firms engaged in interstate commerce, and (b) that the Southerly Extension was designed to transport water to consumers in Newark, including firms engaged in interstate commerce. Counts X–LXIV each recited (a) that the Meadowlands project was designed to improve a portion of Newark for industrial growth, "including the relocation of firms and businesses engaged in interstate commerce," and (b) that Constrad was engaged in performing services for the City of Newark in connection with the City's water supply system, which provided water to persons and firms engaged in interstate commerce.

### (ii) *The Contractors*

Counts II–LXIV each recited that Constrad was organized to perform services in various states and foreign countries and, for that purpose, employed agents in Virginia, Florida, and certain foreign countries.

### (iii) *Movement of supplies and materials*

Every count, including count I, indicated that the projects enumerated therein were "dependent upon interstate commerce for materials, equipment, supplies and labor for completion."

These recitals clearly indicated that the grand jury charged an adverse effect upon interstate commerce to have resulted from the conspiracy as it interfered with all three of the above, and not just with the last, as appellants would have us hold. Since an examination of the court's charge reveals that each of the eight theories upon which it charged falls within one of these three categories of interference, we must reject the appellants' argument.[33]

### 2. *Scope of the Hobbs Act*

Appellants also challenge the court's charge on the grounds that it contains theories of interstate commerce not contemplated by the Hobbs Act. Specifically, appellants cite those portions of the charge which allowed the jury to find the interstate element of the offense if they believed either

(a) that Constrad was formed for the purpose of doing business both within and outside New Jersey, and did engage in business outside of that state;

(b) that Verona Construction Company was, during the time in question, engaged in business in New Jersey and other states; or

(c) that the Meadowlands project was designed to provide facilities for both light and heavy industry engaged in interstate commerce.

Appellants contend that Congress could not have intended to include within the statute extortions with interstate effects as attenuated as these.

The reach of the Hobbs Act is not as limited as appellants assert, however. It outlaws extortion which obstructs interstate commerce *"in any way or degree."* (Emphasis supplied) "That Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference

for an indication of the effect on interstate commerce which the indictment charged as having resulted from the conspiracy to thwart the *construction of projects*, the *contractors* involved, *and* the *movement of supplies*.

33. The language of Count I is drawn in general terms. The Government was therefore not restricted to proving interference as to those projects and contractors enumerated in the substantive counts. Those counts do not purport to be an exhaustive compilation of the acts done in furtherance of the conspiracy, and they could not serve to limit the Government's proof. "[W]hen only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that *under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened.*" Stirone, 361 U.S. at 218, 80 S.Ct. at 274. (emphasis ours).

with interstate commerce by extortion, robbery or physical violence." Stirone v. United States, supra, 361 U.S. at 215, 80 S.Ct. 270, 272. See also United States v. Tropiano, 418 F.2d 1069, 1076 (2nd Cir. 1969); United States v. Amabile, 395 F.2d 47, 49 (7th Cir. 1968).

 It is not necessary that the *purpose* of the extortion be to affect interstate commerce, United States v. Varlack, 225 F.2d 665 (2nd Cir. 1955), but only that one of the *natural effects* thereof be an obstruction of that commerce. Nick v. United States, 122 F.2d 660 (8th Cir.), cert. den. 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550, rehearing denied 314 U.S. 715, 62 S.Ct. 411, 86 L.Ed. 570, rehearing denied, 316 U.S. 710, 62 S.Ct. 1103, 86 L.Ed. 1776 (1941). More specifically, as to the effect upon Constrad and Verona:

> Where the resources of a business are depleted or diminished in any manner or degree by payments of money obtained by extortion the capacity to efficiently conduct such business is to the extent of the drain on its resources likely to be impaired. * * * It is merely required by the law where extortion is shown that it did in some way or degree obstruct, delay or affect commerce. * * * It is the *depletion of the resources of a business* by extortion which permits as a reasonable inference if the extortion is established that its operations are delayed, obstructed, affected.[34] (emphasis supplied)

Clearly the resources of both Constrad and Verona were depleted by the extortionate scheme and their ability to carry on their business in interstate commerce was thereby impaired. As to the Meadowlands project, we agree with Judge Sanborn's observation in Hulahan v. United States, 214 F.2d 441, 445 (8th Cir. 1954);

The exaction of tribute from contractors engaged in *local* construction work * * * who are engaged in constructing *facilities to serve* * * * [*interstate*] *commerce*, is, in our opinion, proscribed by the [Hobbs Act].

 We therefore hold that all theories of interstate commerce contained in the indictment and the court's charge fall within the terms of the Hobbs Act.

### B. *Bribery or Extortion*

As noted *supra* (VI.A.) appellants have argued that the evidence proved bribery, and not extortion. We have rejected that argument. Alternatively, they assert that the evidence at least presented a fact question as to whether the crime involved was extortion or bribery, and that the trial court should therefore have instructed the jury as to the distinction between the two crimes, which appellants contend to be mutually exclusive.

 Even assuming *arguendo* that the appellants are correct as to the state of the evidence and as to the mutual exclusivity of the crimes [35] we have concluded that no error was committed, for the court delivered an adequate charge on the legal questions involved. As outlined in VI.A., supra, the essence of the crime of bribery is voluntariness, while the essence of extortion is duress. People v. Dioguardi, supra; Hornstein v. Paramount, supra. Although the court did not mention the word "bribery" in its charge, it adequately set forth the characteristics distinguishing bribery from extortion. There was no need to instruct in detail as to an offense for which the defendants were not on trial. Bianchi v. United States, 219 F.2d 182 (8th Cir. 1955). The court charged that the jury had to find that the defendants had "wrongfully used *actual fear* * * in order to induce Constrad to pay them

---

34. This language was held to be a proper charge. United States v. Provenzano, 334 F.2d 678, 692–693 (3rd Cir. 1964).

35. *Compare* People v. Feld, 262 App.Div. 909, 28 N.Y.S.2d 796, 797 (1941) (bribery and extortion mutually exclusive), *with* N.Y. Penal Law §§ 135.70, 155.10, 180.-30, 200.15 (McKinney's 1965) (which eliminate the mutual exclusivity of the two crimes).

money. * * * [U]nless the payments here alleged were made under some form of *compulsion,* there is no crime under the Hobbs Act. *The mere voluntary payment of money, unaccompanied by any [fear] of economic loss, would not constitute extortion.*" (emphasis supplied) This charge was entirely fair and adequately informed the jury of the issue before them.

The remaining contentions of the appellants are also without merit and require no extended discussion. Upon consideration of the record as a whole, we find that the trial was conducted fairly, impartially and with careful regard for the rights of the appellants.

Accordingly, the judgments of conviction will be affirmed.

A P P E N D I X

Exhibit 1300

FLOW OF CASH

CITY OF NEWARK

$9,698,880.98

C. SALVATORE AND SONS, INC.
SOUTH SIDE PROJECT

$100,944.29 $52,049.02 $1,959,131.59

THE MAL-BROS. CONTRACTING CO.

C.F. MALANKA AND SONS, INC.

GALLO COMPANIES:
PASSAIC CRUSHED STONE CO., INC.
HUDSON CRUSHED STONE SALES CO.
NORTH JERSEY CONCRETE PIPE CO., INC.
NEW JERSEY CONCRETE PIPE COMPANY, INC.

$13,977.67

GALLO COMPANIES:
CENTRAL JERSEY CONCRETE PIPE CO., INC.
PASSAIC CRUSHED STONE CO., INC.
GALLO ASPHALT CO.
CENTRAL NEW JERSEY ASPHALT CORPORATION
HUDSON CRUSHED STONE SALES CO.

$186,182.20 $558,121.12

$152,459.25

THE CONDUIT AND FOUNDATION CORP.
AND
THE MAL-BROS. CONTRACTING CO.
A JOINT VENTURE

$17,985.83

KANTOR SUPPLY

$911,445.00

JOSEPH BIANCONE
ANTHONY GAGLIANO
(TONY G)

[A4437]