**UNITED STATES of America**

v.

**Hubert Francis COLE, a/k/a "Dr. Hugh Cole" a/k/a "Milutin Colovic," Vjekoslav Spanjol, a/k/a "V.J." a/k/a "Slavko," Bahrudin Bijedic, a/k/a "Burri," Larry Card, LBS Bank of New York, Inc., Vinko Mir.**

Crim. A. Nos. 88–516–02, 88–516–03, 88–516–05 and 88–516–06.

United States District Court, E.D. Pennsylvania.

June 7, 1989.

U.S. Atty., Michael M. Baylson by Thomas J. Rueter, Paul A. Sarmousakis, Asst. U.S. Attys., Philadelphia, Pa., for plaintiff.

Michael Goode, Lincolnwood, Ill., for defendant, Bahrudin Bijedic.

Jacob Laufer, New York City, and Donald Goldberg, Philadelphia, Pa., for defendant, Vinko Mir.

Kathleen Beggs, and Vincent Fuller, Washington, D.C., for defendant, LBS Bank of New York.

## MEMORANDUM AND ORDER

DuBOIS, District Judge.

Presently before the Court are the pretrial motions of defendants Bahrudin Bijedic, Vinko Mir and LBS Bank of New York, Inc. (1) to inspect the grand jury testimony, or, in the alternative, for an in camera inspection of the grand jury testimony by

the Court; (2) to dismiss the superseding indictment; and (3) to sever the trial. In addition, the Court has before it the pretrial motions of defendant Bahrudin Bijedic (1) to transfer venue; (2) to recognize the applicability of consular immunity; and (3) to recover items wrongfully seized. Oral argument was held on these motions on May 9, 1989.

### I. *Facts:*

The alleged facts of this case, as set forth in the superseding indictment and the submissions of counsel, may be summarized as follows:

On or about July 9, 1987, an undercover Customs agent, posing as a financial consultant rendering services to organized crime figures, contacted an individual referred to as "R.G." in the superseding indictment. At this meeting, which took place in Delaware, the agent stated that he wanted to convert a large amount of United States currency in small bills into larger bills for transportation out of the country.

R.G. put the Customs agent in touch with defendant Larry Card. Card stated that he was an international banker and could help the agent transport the money overseas. Card also put the Customs agent in touch with defendant Hubert Francis Cole. In a series of meetings, Cole outlined a method of laundering large amounts of cash without filing the reports required by the United States government.

On October 22, 1987, Cole received and transported $50,000 in United States currency from Philadelphia to Bermuda without filing a Report of International Transportation of Currency or Monetary Instruments (hereinafter "CMIR Form") or a Currency Transaction Report (hereinafter "CTR") as required by law.

On November 19, 1987, Cole received and transported $100,000 from Philadelphia to Bermuda without filing a CMIR Form or a CTR. On November 21, 1987, Cole met defendant Vjekoslav Spanjol in Bermuda. Cole and Spanjol travelled with the $100,000 from Bermuda to London, Great Britain and then to Zagreb, Yugoslavia. While in Yugoslavia, they deposited $90,000 in the Privredna Banka in Yugoslavia. On December 14, 1987, Cole sent to Philadelphia a copy of a document authorizing the wire transfer of $85,000 from the Privredna Banka in Yugoslavia to a bank in Bermuda.

On January 19, 1988, the Customs agent met with Cole in Philadelphia to discuss smuggling large sums of cash from the United States using a consular officer of the Yugoslavian government. Over the course of the next three days, Cole received approximately $200,000 and transported the cash to Yugoslavia without filing a CMIR Form or a CTR. Cole also received $2,000 in cash as an advance commission for the laundering trip.

On February 18, 1988, the Customs agent introduced Cole to an undercover agent of the Internal Revenue Service, Criminal Investigation Division, as the Custom agent's superior. At that meeting, Cole stated that he could smuggle money out of the United States into Yugoslavia as a diplomatic courier by sealing the money in a diplomatic pouch. Approximately one week later, Cole gave the Customs agent a check drawn on Jugo Banka Agency, Inc., New York, for $198,000, which represented a portion of the $200,000 smuggled to Yugoslavia on January 22, 1988. The next day, Cole received and transported $200,000 in cash from Philadelphia to Yugoslavia without filing a CMIR Form or a CTR. Cole was also paid $10,000 in cash as the commission balance from the previous funds that Cole had laundered.

On March 22, 1988, Cole met with an officer of defendant LBS Bank of New York, Inc. and opened a checking account in the name of Lehman, Kuhn Associates, Ltd. Cole signed the name "Milos Vrenc" on the signature card for the account. On March 24, 1988, the IRS agent and Cole met with an officer of LBS Bank. During that meeting, the IRS agent deposited $53,500 in cash in LBS Bank and received a bank check in the amount of $50,000.

On April 1, 1988, the IRS agent and Cole met with defendant Vinko Mir, Chairman of the Board of LBS Bank. During that meeting, the IRS agent deposited $81,695

in cash in LBS Bank and received a bank check in the amount of $76,350. At the same meeting, Cole stated that he would supply Mir with all the necessary information to complete the CTRs required for the March 24 and April 1 transactions. Mir filed the CTRs for the transactions on April 13, 1988.

On May 11, 1988, Mir met with the IRS agent and discussed the fact that the CTRs filed by LBS Bank on April 13, 1988 contained material omissions and misstatements of fact. Mir reassured the IRS agent that the CTRs would not be changed and that bank regulators would not discover the inaccuracies.

On April 9, 1988, Cole and Spanjol received and transported $300,000 in cash from Philadelphia to Yugoslavia without filing a CMIR Form or a CTR. On April 11, 1988, Spanjol deposited $299,500 in cash in a bank in Yugoslavia. On April 13, 1988, Spanjol caused $299,000 of funds held in an account at Ljubljanska Banka, the Yugoslavian parent company of LBS Bank, to be transferred by wire to Cole's account with LBS Bank. On April 28, 1988, Cole met with the Customs agent in Philadelphia and gave the agent a check drawn on the LBS Bank for $300,000.

During the trip to Yugoslavia on April 9, 1988, Cole and Spanjol transported two Sea Pak 25 Closed Circuit Rebreather Scuba Units. The rebreathers are classified as special warfare equipment and require a special export license which Cole and Spanjol did not acquire. The rebreathers were delivered to Cole and Spanjol through an agent located in West Germany.

On August 11, 1988, Cole, Spanjol and the Customs agent met with defendant Bahrudin Bijedic, the Consul–General of Yugoslavia, in Chicago, Illinois. On that date, Cole brought a trunk containing $500,000 in cash to the Consulate General of Yugoslavia where seals with the printing of the Consulate General of Yugoslavia were affixed to it; the cash had been supplied to Cole by the Customs agent. Bijedic then drove Cole, Spanjol, the Customs agent and the trunk containing the cash to O'Hare International Airport in Chicago.

En route, Cole gave the Customs agent a copy of a letter bearing Bijedic's signature that purported to notify the United States Department of State that Spanjol and Cole were assigned to the diplomatic service of Yugoslavia as couriers. In the letter, Cole was identified as "Milutin Colovic." Cole and Spanjol then transported the $500,000 from Chicago to Yugoslavia without filing a CMIR Form or a CTR.

On October 18, 1988, Cole, Spanjol, Bijedic and the Customs agent met in Chicago. They discussed Bijedic's continued assistance in exporting millions of dollars in United States currency without filing the reports required by law.

On December 1, 1988, Cole and Spanjol met with the Customs agent at Philadelphia International Airport for the purpose of transporting $2,000,000 to Yugoslavia without filing the necessary reports. Bijedic travelled to Palwaukee Airport near Chicago on that same date to meet with Cole, Spanjol and the Customs agent to assist them in transporting the money to Yugoslavia.

On that same day, a federal grand jury returned a twenty-one count indictment against Cole, Spanjol, Card, Bijedic, Mir and LBS Bank. On December 6, 1988, Magistrate Richard A. Powers III ordered that Cole and Spanjol be detained pending trial pursuant to 18 U.S.C. § 3142. Those detention Orders were affirmed by this Court on December 23, 1988 and by the Third Circuit on January 10, 1989.

On April 6, 1989, a federal grand jury returned a twenty-two count superseding indictment against Cole, Spanjol, Card, Bijedic, Mir and LBS Bank. Count I of the superseding indictment charges all the defendants with conspiracy to defraud the United States in violation of 18 U.S.C. § 371. In addition, Cole is charged with six counts and Spanjol is charged with two counts of failing to file United States Customs currency reports in violation of 31 U.S.C. §§ 5316(a)(1)(A) and 5322(b). Cole is charged with five counts, Spanjol is charged with three counts, and Bijedic is charged with one count of laundering proceeds of an unlawful activity in violation of

18 U.S.C. § 1956. Cole is charged with six counts and Spanjol is charged with two counts of failing to file Internal Revenue Service currency transaction reports in violation of 31 U.S.C. §§ 5313 and 5322(b). Cole is charged with three counts and Spanjol is charged with one count of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952. Cole and Spanjol are charged with one count of violating the Arms Export Control Act, 22 U.S.C. § 2778.

On April 18, 1989, Cole entered a plea of guilty to the charges in the superseding indictment. The remaining defendants have not been arraigned on the superseding indictment.

## II. *Motions to Inspect Grand Jury Testimony:*

Two motions are before the Court which seek an inspection of the grand jury testimony by the defendants, or in the alternative, an in camera inspection of the grand jury testimony by the Court. One motion was filed jointly by Mir and LBS Bank, and the other was filed by Bijedic. Both motions allege that the Government failed to present substantial and material exculpatory evidence to the grand jury.

■ The Third Circuit has not decided whether a prosecutor has a duty to present exculpatory evidence to a grand jury. *U.S. v. Ismaili*, 828 F.2d 153, 165 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988). However, the Third Circuit recognized that a majority of courts considering the issue have decided that such a duty does not exist. *Id.*, 828 F.2d at 165 n. 13.

■ The district courts in this circuit have rejected such a blanket rule. Generally, courts in this circuit have held that when a prosecutor is aware of substantial exculpatory evidence, the evidence should be disclosed to the grand jury if it could reasonably cause the grand jury not to indict. *United States v. Litman*, 547 F.Supp. 645, 649 (W.D.Pa.1982). *See also, United States v. Fisher*, 692 F.Supp. 495, 504 (E.D.Pa.1988); *Kudisch v. Overbeck*,

618 F.Supp. 196 (D.N.J.1985). To prevail on their motions to have the Court inspect the grand jury testimony, the defendants must show that the prosecutor's failure to introduce the evidence was deliberate. *Litman*, 547 F.Supp. at 650.

The defendants have a heavy burden of proof. Such a standard of proof is necessary to prevent the grand jury proceedings from becoming a "minitrial" on the merits and forcing the trial judge to review the grand jury minutes every time the defendant alleges that exculpatory evidence was not presented to the grand jury. *See id.*, 547 F.Supp. at 649. The rationale for the rule is clear—"Even if an indictment is filed, the defendants could only be found guilty after a guilty plea is accepted or after the completion of a criminal trial in which guilt was established beyond a reasonable doubt." *Id.*

■ The allegations made by Bijedic do not require this Court to conduct an examination of the grand jury testimony. Bijedic alleges that the Government withheld evidence that the seals on the trunk containing $500,000 in cash, which was transported from Chicago to Yugoslavia on August 11, 1988, were not official Yugoslavian seals but were seals purchased by Cole from a stationary store. In addition, Bijedic alleges that the Government knew that his signature on the alleged courier letter was a forgery.

The facts offered in support of Bijedic's allegations are insufficient to cause the Court to conduct an in camera inspection. Bijedic has failed to show that the Government knew of any exculpatory evidence. Specifically, there is no evidence that the Government knew the seals were not authentic when it presented the case before the grand jury. The evidence regarding the seals suggests, at most, that the Government conducted a negligent investigation by failing to discover what an authentic Yugoslavian diplomatic seal looked like.

Similarly, there is no evidence that the Government knew Bijedic's signature was forged on the alleged courier letter. Bijedic contends that the Government must have

known because his experts' findings were made available to the Government. However, the Government is not required to accept the findings of the defendants' experts as fact. Bijedic also contends that an affidavit by Louise Hodess, a Customs agent involved in the investigation, proves that the Government knew that the signature was forged. That affidavit states that Mary Mochary, Privileges and Immunities Section, Legal Advisors Office, of the United States State Department determined that the purported courier letter was invalid. Although the affidavit reveals that something about the letter was improper, it does not state that Ms. Mochary determined that the letter was a forgery.

Assuming, *arguendo*, that the diplomatic seals were not authentic and that Bijedic's signature was forged, and that the Government had knowledge of both of these facts, an inspection of the grand jury testimony is still not warranted. To prevail on his motion, Bijedic must show that the exculpatory evidence could reasonably have led the grand jury not to indict if the evidence was presented. This he failed to do because the charges against him are not limited to the diplomatic seals or the courier letter. After examining the superseding indictment, the Court determines that the presentation of the alleged exculpatory evidence would not reasonably have led the grand jury not to indict.

█ The allegations made by Mir and LBS Bank do not require this Court to conduct an examination of the grand jury minutes. Mir and LBS Bank contend that some of the tapes made by the Government exculpate them. They conclude that the fact of the indictment by the grand jury establishes that the Government failed to present the tapes with the exculpatory evidence to the grand jury. Mir and LBS Bank point to the tapes made by the Government on May 11, 1988 and June 1, 1988.

After having reviewed the transcripts of the tapes made on those two days, the Court concludes that the grand jury would have indicted Mir and LBS Bank whether or not those tapes were played. While some statements made on those days are favorable to Mir and LBS Bank, the statements do not exonerate Mir and LBS Bank of all participation in the alleged conspiracy.

The allegations of Mir and LBS Bank are strikingly similar to those presented to Judge Brotman in *United States v. Kraselnick*, 702 F.Supp. 480 (D.N.J.1988). In *Kraselnick*, the defendants, a bank and several officers of the bank, were indicted for failing to file CTRs in connection with several cash transactions in violation of, *inter alia*, 18 U.S.C. § 371. The defendants moved to dismiss the indictment. They contended that the Government failed to present "overwhelming proof" that the defendants did not have the requisite specific intent to commit the crimes charged in the indictment. *Id.*, 702 F.Supp. at 486. The motion to dismiss the indictment was denied, without any inspection of the grand jury testimony by the court, on the ground that the allegations were insufficient. *Id.*

Bijedic, Mir and LBS Bank have failed to allege facts sufficient to warrant an in camera inspection of the grand jury minutes by the Court. A fortiori, they have failed to allege facts sufficient to require the Court to order an inspection of the testimony by the defendants. Accordingly, their motions for inspection of grand jury testimony will be denied.[1]

### III. *Motions to Dismiss the Superseding Indictment:*

Two motions are before the Court which seek to have the superseding indictment dismissed. One motion was filed by Mir and LBS Bank, and the other was filed by Bijedic. Those motions will be denied.

---

1. In connection with these motions, the Government filed an affidavit under seal outlining some of the evidence that the Government presented to the grand jury that issued the superseding indictment. Although the Court finds, separate and apart from the affidavit, that an inspection of the grand jury testimony is not warranted in this case, the affidavit assures the Court that the grand jury was not misled.

Mir and LBS Bank first contend that the superseding indictment should be dismissed for prosecutorial misconduct in the grand jury proceedings. The alleged misconduct is identical to the misconduct alleged in their motion requesting an inspection of the grand jury testimony. This argument is insufficient for the reasons given by the Court in denying their motion for inspection of the grand jury testimony.

Second, Mir and LBS Bank seek to have the superseding indictment dismissed for failure to charge Mir and LBS Bank with a crime. The superseding indictment charges that Mir and LBS Bank knowingly filed CTRs for the transactions of March 24, 1988 and April 1, 1988 which contained material omissions and misstatements of fact in violation of 31 U.S.C. § 5324. That section provides that:

No person shall for the purpose of evading the reporting requirements of [31 U.S.C. § 5313(a)] with respect to such transaction ... (2) cause or attempt to cause a domestic financial institution to file a report required under [31 U.S.C. § 5313(a)] that contains a material omission or misstatement of fact....

Mir and LBS Bank contend that the purported omissions and misstatements of fact did not relate to matters required by 31 U.S.C. §§ 5313(a) and 5324; therefore, no crime was charged.

This issue has been raised prematurely. Mir and LBS Bank assume that the only alleged misstatements or omissions charged by the Government relate to the identity of the depositor and/or the source of the funds. The Government contends, however, that "nearly all the material information on the [CTRs] ... were false and that [LBS Bank] and Mir knowingly filed them with knowledge of their falsity." Assuming, *arguendo*, that Mir and LBS Bank had no duty to disclose the identity of the depositor or the source of the funds, other omissions or misstatements may exist. Accordingly, this issue should be raised at the conclusion of the Government's case-in-chief at trial when the Court can better determine the evidence supporting the alleged misstatements or omissions.

Bijedic seeks to dismiss Count I and Count XXII of the superseding indictment for various alleged ambiguities. In the alternative, Bijedic requests that alleged surplusage be stricken and that the Government provide a bill of particulars.

■ To the extent that Bijedic contends that the indictment is insufficient, the indictment must be examined employing the test enunciated in *United States v. Addonizio*, 451 F.2d 49 (3d Cir.1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972):

The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, "and sufficiently appraises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction."

*Id.*, 451 F.2d at 58, *quoting Hagner v. United States*, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932).

■ Examining Count I of the superseding indictment against the rule stated in *Addonizio*, the Court finds that the superseding indictment is not sufficient. Although Count I contains all the elements necessary to prove a violation of 18 U.S.C. § 371 for conspiracy, it does not sufficiently inform Bijedic of the offense charged "so that he will not be misled while preparing his defense," *United States v. Brozyna*, 571 F.2d 742, 746 (2d Cir.1978), and it does not show with accuracy the extent to which he may plead a former acquittal or conviction.

Paragraph 41 of the "Overt Acts" section of Count I of the superseding indictment alleges that "... Cole gave the undercover agent a copy of a letter bearing the signature of the defendant Bahrudin Bijedic notifying the United States Department of State that Spanjol and Cole were assigned to the diplomatic service of Yugoslavia as couriers." Paragraph 39 of the "Overt Acts" section of Count I of the

superseding indictment alleges that the Customs agent "brought the trunk containing $500,000 to the Consulate General of Yugoslavia in Chicago where seals with printing of the Consulate general were affixed on it." Those paragraphs do not inform Bijedic whether he is charged with signing the courier letter and affixing the seals on the trunk, or whether those acts were accomplished by another defendant.

The ambiguities of ¶¶ 39 and 41 raise a concern with the Court regarding jeopardy and the parameters of the charges Bijedic is defending. Accordingly, the Court finds that a bill of particulars as to these paragraphs is appropriate to inform Bijedic of the precise charges against him and to establish the parameters of the Government's case.[2] *See United States v. Smith,* 776 F.2d 1104, 1111 (3d Cir.1985).

Likewise, the Court finds that Count XXII of the superseding indictment does not meet the test of *Addonizio.* Although that count sufficiently states the elements of the offense charged, the charge is too vague to allow Bijedic to adequately prepare his defense. Accordingly, the Court will direct that the Government provide all defendants with a bill of particulars pursuant to Fed.R.Crim.P. 7(f) outlining the facts relating to Count XXII.

Bijedic's motion to strike surplusage from the superseding indictment will be denied. After reviewing the superseding indictment, the Court does not find that any of the challenged sections are "not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Napolitano,* 552 F.Supp. 465, 480 (S.D.N.Y.1982).

### IV. *Motions to Sever:*

Two motions are before the Court which seek to sever the trial. One motion was filed jointly by Mir and LBS Bank, and the other was filed by Bijedic. Both motions allege misjoinder under Fed.R.Crim.P. 8(b),

and, in the alternative, seek to have the Court sever the trial pursuant to Fed.R. Crim.P. 14. Specifically, Mir, LBS Bank and Bijedic seek to sever the parties, and, in the alternative, seek to sever Count I and Count XXII from the remaining counts. At the hearing held on May 9, 1989, counsel for Spanjol stated that he would object to severing the parties but would not object to severing offenses.

■ It is well established that cases involving the joinder of multiple defendants are governed by Rule 8(b). *United States v. Kopituk,* 690 F.2d 1289, 1312 (11th Cir. 1982), *cert. denied.* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). *See generally* 1 C. Wright, *Federal Practice and Procedure* § 144 (1982). Rule 8(b) provides that:

> (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

A motion under Rule 8(b) alleging misjoinder must be addressed to the pleadings. *United States v. Somers,* 496 F.2d 723, 729 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). *See also, Schaffer v. United States,* 362 U.S. 511, 514, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1959). Generally, Rule 8(b) is satisfied if the indictment charges a single conspiracy, even though one or more, but not all, of the defendants, are charged with various substantive counts arising from the same conspiracy. *See United States v. Weinrich,* 586 F.2d 481, 495 (5th Cir.1978), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979).

---

**2.** "The purpose of a bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare for his defense, to avoid surprise during the trial and to protect him against a second

prosecution for an inadequately described offense." *Addonizio,* 451 F.2d at 63–64, *quoting United States v. Tucker,* 262 F.Supp. 305, 308 (S.D.N.Y.1966).

"A single, continuing conspiracy is demonstrated where the evidence proves that the essential feature of the existing conspiracy was a common plan or scheme to achieve a common, single, comprehensive goal." *Blumenthal v. United States*, 332 U.S. 539, 557–59, 68 S.Ct. 248, 256–58, 92 L.Ed. 154 (1947). A single core conspiracy may attract different members at different times and involve different subgroups committing acts in furtherance of the overall plan. *See United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir.1982), *cert. denied*, 462 U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983).

The problem most troubling to the Court is whether the allegation in Count XVIII of the superseding indictment relating to violations of the Arms Export Control Act, 22 U.S.C. § 2778 is part of the core conspiracy charged in Count I. During the trip to Yugoslavia on April 9, 1988, Cole and Spanjol are alleged to have caused the transportation of special warfare equipment which required a special export license. To further complicate this issue, a reference to conversations regarding the smuggling of controlled technology in the "Overt Acts" section of the conspiracy count in the original indictment was removed from the superseding indictment.

■■■■ At this stage in the proceedings, however, the Court may not judge the Government's case to determine whether a single conspiracy or multiple conspiracies exist. "Provided that the conspiracy charge is put forward in good faith, the combination of a conspiracy count with counts charging acts in furtherance of the conspiracy will survive attack under Rule 8(b)." *Somers*, 496 F.2d at 730. The question of whether a single or multiple conspiracies existed is a fact question for the jury. *United States v. Smith*, 789 F.2d 196, 200 (3d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). As the defendants have made no allegation of bad faith on the part of the prosecution in drafting the superseding indictment, the Court may not pre-judge the Government's case. Accordingly, joinder is proper under Rule 8(b).

■■■■ The decision to grant or deny a motion for severance under Rule 14 rests in the sound discretion of the trial court. *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir.1981). Before relief may be granted under that rule, the defendant must show "clear and substantial prejudice." *United States v. Gorecki*, 813 F.2d 40, 43 (3d Cir.1987). "[D]efendants are not entitled to severance merely because the evidence may be more damaging against a co-defendant and there is a danger of spillover." *United States v. DiPasquale*, 561 F.Supp. 1338, 1347 (E.D.Pa.1983), *aff'd*, 740 F.2d 1282 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985).

■■■ In this case, the analysis under Rule 14 must focus on "whether the evidence is such that the jury cannot be expected to 'compartmentalize' it and then consider it for its proper purposes." *United States v. Dansker*, 537 F.2d 40, 62 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). The defendants have failed to persuade the Court that a jury would be unable to compartmentalize the evidence in this case. The alleged events occurred during precise time periods, and the involvement of Mir and LBS Bank does not overlap with the involvement of Bijedic at all. Moreover, the acts charged in Count XVIII are clearly delineated and involve only Cole and Spanjol. Therefore, the Court finds the participation of each defendant may be isolated without difficulty by the jury at trial.

■■■ The real fear of the defendants does not seem to be that a jury would be unable to compartmentalize the evidence, but that Mir, LBS Bank and Bijedic may suffer some sort of guilt by association. Absent extraordinary circumstances not present in this case, the possibility of guilt by association does not provide grounds for severance. *See, United States v. Boyd*, 595 F.2d 120, 125 (3d Cir.1978); *DiPasquale*, 561 F.Supp. at 1348. Accordingly, the motions to sever the trial will be denied.

## V. *Motion for a Change of Venue*

■ Before the Court is Bijedic's motion to transfer the action for improper venue. In a conspiracy, venue is appropriate where any of the overt acts occurred. *Hyde and Schneider v. United States*, 225 U.S. 347, 367, 32 S.Ct. 793, 802, 56 L.Ed. 1114 (1912); *United States v. Boyance*, 329 F.2d 372, 375 (3d Cir.), *cert. denied*, 377 U.S. 965, 84 S.Ct. 1645, 12 L.Ed.2d 736 (1964). "In a conspiracy case, a conspirator may be tried in a district with which he has had no contact if his co-conspirators have committed overt acts there." *United States v. Bloom*, 78 F.R.D. 591, 607–08 (E.D.Pa.1977).

■ The indictment alleges several overt acts committed within the Eastern District of Pennsylvania. Having already determined that Bijedic is properly joined in Count I of the superseding indictment charging conspiracy, venue is proper in this district. Accordingly, the motion for a change of venue will be denied.

## VI. *Motion to Recognize the Applicability of Consular Immunity:*

■ Before the Court is Bijedic's motion to recognize the applicability of consular immunity under two treaties to which the United States is a party. Bijedic argues that consular immunity is applicable under the Most Favored Nations ("MFN") clause in Article II, Convention Defining the Rights, Privileges and Immunities of Consular Officers, October 14, 1881, United States—Serbia, 22 Stat. 968, T.S. No. 320 (hereinafter "U.S.—Serbian Consular Convention"). In the alternative, Bijedic contends that immunity is applicable under the Vienna Convention On Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6920, 596 U.N.T.S. 261 (hereinafter "Vienna Convention"). The Government contends that the U.S.—Serbian Consular Convention does not afford Bijedic immunity and that the applicability of the Vienna Convention cannot be determined until after trial.

Article II of the U.S.—Serbian Consular Convention provides that:

The consuls-general, consuls, vice-consuls and consular agents of the two High Contracting parties shall enjoy reciprocally, in the states of each other, all the privileges, exemptions, and immunities that are enjoyed by officers of the same rank and quality of the most favored nation.

The U.S.—Serbian Consular Convention is still in force. *See* U.S. Department of State, *Treaties in Force* (Dept. of State Pub. 9430) at 252 (1988).

Bijedic argues that the MFN clause in the U.S.—Serbian Consular Convention is self-executing and automatically raises the immunity afforded to Yugoslavian consular officers. Therefore, Bijedic contends that Yugoslavian consular officers should be granted the full immunity afforded to Soviet consular officers in the Consular Convention and Protocol, July 13, 1968, United States—Soviet Union, 19 U.S.T. 5018, T.I.A.S. No. 6503 (hereinafter "U.S.—Soviet Consular Convention"). The Government does not contest the validity of either treaty, the extent of the immunity afforded to Soviet consular officers in the U.S.—Soviet Consular Convention, or the validity of the MFN clause in the U.S.—Serbian Consular Convention. Rather, the Government argues that the MFN clause in the U.S.—Serbian Consular Convention is not self-executing, but requires the beneficiary of the clause to issue a written statement promising to provide U.S. consular officers with reciprocal immunity. Since such a written statement has not been issued by Yugoslavia, the Government contends that Bijedic, as consul-general, is not entitled to an increased level of immunity under the U.S.—Serbian Consular Convention.

The analysis of a treaty must begin "with the text of the treaty and the context in which the written words are used." *Air France v. Saks*, 470 U.S. 392, 396–97, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985). The text of the MFN clause in Article II of the U.S.—Serbian Consular Convention includes the phrase "... shall be reciprocal...." The plain meaning of this phrase is that the MFN clause is self executing. *Cf. United States v. Chindawongse*, 771 F.2d 840, 848 n. 10 (4th Cir.1985) (phrase in

MFN clause of consular convention—"shall be entitled on condition of reciprocity"—requires special agreement before a raise in level of immunity), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 859, 88 L.Ed.2d 898 (1986). In this case, unlike *Chindawongse,* the treaty language mandates reciprocity; the grant of immunity is not conditional.

The plain meaning accorded to the language of the U.S.—Serbian Consular Convention controls unless the "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982), *quoting Maximov v. United States,* 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963). *See also MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1143 (3d Cir.1988). The course of conduct of parties to an international agreement is evidence of the parties intent. *O'Connor v. United States,* 479 U.S. 27, 33, 107 S.Ct. 347, 351, 93 L.Ed.2d 206 (1986).

The intent of Yugoslavia and the United States as evidenced by their prior conduct contradicts the plain meaning of the U.S.—Serbian Consular Convention. Before 1923, the United States viewed all MFN clauses as "conditional," that is, requiring reciprocity on the part of the country claiming the benefits of a treaty between the United States and a third country. *See generally,* 5 G. Hackworth, *Digest of International Law,* 271–75 (1943). Subsequent to 1923, the United States adopted the unconditional MFN clause in commercial treaties. *See id.*

Notwithstanding the adoption of unconditional MFN clauses in commercial treaties after 1923, the United States did not change its view that MFN clauses in consular conventions were conditioned on reciprocity. In 1931, the Legal Adviser of the Department of State wrote, "The recent change in our treaty-making policy as regards matters of commerce does not effect earlier treaties which do not contain the unconditional most-favored-nations clauses.... At no time have the favored na-

tions provisions in our Consular Conventions been construed by the Department as other than conditional provisions." *Id.* at 274. In response to a 1931 inquiry from Switzerland regarding the application of an MFN clause in an 1850 treaty with that country, the U.S. Department of State wrote:

> [T]his Department has consistently held that the most-favored-nation clause with respect to rights and privileges of consular officers does not embrace unconditionally specific rights and privileges which are granted on the basis of reciprocity to consular officers of third countries, but that the right to enjoy such specific rights and privileges is embraced in the most-favored-nations clause in the event that the country whose consular officers assert such rights or privileges thereunder accords in fact the same rights and privileges to American consular officers in their territories.

*Id.* at 275.

An implicit condition of reciprocity has been repeated in post–1923 Department of State interpretations of other consular conventions. *See* 4 G. Hackworth, *Digest of International Law,* 701–05; 784–85 (1942). The United States continues to imply a condition of reciprocity in MFN clauses in consular conventions. *See* Declaration of Mary Mochary, Principal Deputy Legal Adviser of the Department of State, March 17, 1989.

■ United States Government statements of policy and practice regarding MFN clauses are entitled to great weight when determining the proper application and interpretation of a treaty provision. *See Sumitomo,* 457 U.S. at 184–85, 102 S.Ct. at 2379 ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."). The consistent practice of the Department of State has been to accord MFN treatment in consular conventions on the basis of actual reciprocity.

Perhaps most important is the history and practice surrounding the U.S.–Serbian

Consular Convention. In a note sent in 1930 by the Department of State to the Yugoslav Legation regarding the privilege of duty free importation of articles for personal use, the Department states:

The Department of State does not, however, consider that Yugoslav consular officers assigned to the United States are entitled under the most-favored-nation clause of the [U.S.–Serbian Consular Convention] to exemption from duty on articles imported for their personal or family use unless it be shown that a like privilege is extended to American consular officers in Yugoslavia. Upon receipt of information from the Yugoslav Legation that American consular officers assigned to Yugoslavia are accorded this privilege, the Department of State will take steps with a view to having such benefit extended to Yugoslav consular officers assigned to the United States, under the most-favored-nation clause of Article II of the Consular Convention concluded between the United States and Serbia in 1881.

4 G. Hackworth, *Digest of International Law,* at 704 (1942). Clearly, at least since 1930, the Yugoslavian government has had direct notice of the United States' interpretation of the U.S.–Serbian Consular Convention.[3] However, the Court has no evidence in the form of a written assurance or an actual case history that the Yugoslavian Government has granted reciprocal privileges and immunities to U.S. consular officers. Because there is no evidence of actual reciprocity, the MFN clause in the U.S.–Serbian Consular Convention does not raise the immunities of Yugoslavian consular officers stationed in the United States to the level of immunity granted in the U.S.–Soviet Consular Convention. Accordingly, the Court holds that the U.S.–Serbian Consular Convention does not provide immunity to Bijedic for the acts charged in the superseding indictment.

**3.** The Yugoslavian Government has a history of resisting the extension of diplomatic privileges and immunities. At the United Nations Conference on Diplomatic Intercourse and Immunities in Vienna from March 2 to April 14, 1961, Dr. Milan Bartos, the Yugoslavian representative, stated that the Yugoslavian government was op-

In the alternative, Bijedic contends that the Vienna Convention provides immunity from prosecution. The Government argues that this decision should be postponed by the Court until after the Government's case-in-chief at trial.

The Vienna Convention is a multilateral convention to which over 100 states, including the United States and the Socialist Federal Republic of Yugoslavia, are parties. *See* U.S. Department of State, *Treaties in Force,* (Dept. of State Pub. 9430) at 279 (1988). The Vienna Convention codifies international law regarding consular functions and immunities. It is still in force and is binding on the United States. *Id.*

Bijedic and the Government agree that Bijedic does not enjoy diplomatic status in the United States, which would confer on him absolute immunity for the commission of any crime in the United States. *See* Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95. Bijedic was recognized by the United States Government as Consul General of Yugoslavia at Chicago on January 21, 1986 and continued to serve in that capacity at least until his arrest on December 1, 1988. *See* Certification of Richard Gookin, Associate Chief of Protocol, United States Department of State, December 6, 1988.

Article 43 of the Vienna Convention sets forth the immunity from jurisdiction accorded consular officers in the United States:

### ARTICLE 43

#### Immunity From Jurisdiction

1. Consular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State in respect of acts performed in the exercise of consular functions.

posed in principle to the extension of diplomatic privileges and immunities to "an unduly wide circle of persons." *Yugoslavia at the United Nations Conference on Diplomatic Intercourse and Immunities,* 2 Yugoslav Survey 899, 890 (1961).

Bijedic's argument and the Government's response raises two issues, as follows: (1) the timing of a decision on the question of consular immunity, and (2) whether Bijedic's alleged criminal acts were performed in the exercise of consular functions.

### A. Timing of Decision on Consular Immunity:

▮ The Government requests that the Court refrain from deciding the applicability of the Vienna Convention until the conclusion of its case-in-chief. At that time, the Government argues, the Court will have the benefit of hearing the testimony regarding the acts of Bijedic before having to determine whether those acts were official consular functions. An analysis of the language of the Vienna Convention and the purpose of the immunity clause leads the Court to the conclusion that the applicability of the Vienna Convention must be decided pretrial.

The theoretical basis for diplomatic immunity is generally agreed to be "functional necessity." *See*, Milhaupt, *The Scope of Consular Immunity under the Vienna Convention on Consular Relations: Towards a Principled Interpretation*, 88 Colum.L.Rev. 841, 848–49 (1988) [hereinafter Milhaupt]; Note, *Insuring Against Abuse of Diplomatic Immunity*, 38 Stan.L.Rev. 1517, 1520–22 (1986). "The functional necessity theory rests on the premise that without protection from legal and political interference by the receiving state, agents in international relations would be largely at the mercy of their host governments for the degree to which they could fulfill their duties." Milhaupt at 848. This theory of functional necessity is expressly incorporated in the preamble to the Vienna Convention, which states that "the purpose of ... privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective states."

The purpose of the immunities conferred by the Vienna Convention would be frustrated if its applicability were not determined by the trial court until the end of trial. There is no question that the ability of the consular officer would be hampered were he/she forced to defend an action until the end of the Government's case-in-chief before the issue of immunity was resolved. In no case is that more evident than in a protracted trial such as this one promises to be, where the full trial may last over four weeks.

The terms of the Vienna Convention provide that where immunity applies, the court of the receiving state is deprived of jurisdiction. The immunity is not from punishment or penalty, but immunity from prosecution. *But see Heike v. United States*, 217 U.S. 423, 30 S.Ct. 539, 54 L.Ed. 821 (1910) (statute providing immunity from prosecution construed to provide immunity from successful prosecution). Therefore, the trial court is obligated to determine as soon as practicable whether consular immunity is applicable under the Vienna Convention. Accordingly, I hold that the applicability of the Vienna Convention must be considered pretrial under the facts alleged in the superseding indictment. If immunity is not applicable under those facts, then the issue may be raised again after the conclusion of the Government's case-in-chief to determine if the facts presented at trial would support the applicability of consular immunity.

### B. Consular Functions:

▮ Bijedic argues that the acts charged in the superseding indictment were in furtherance of his official duties because he could not have accomplished the acts but for his position as a consular officer. In making that argument, Bijedic contends that he is charged with participating in only two acts in furtherance of the alleged conspiracy—affixing diplomatic seals to the trunk containing $500,000 cash and signing a courier letter authorizing Cole and Spanjol to act as Yugoslavian diplomatic couriers—neither of which would have been possible without the power Bijedic possesses as the Consul–General.

Bijedic cites no precedent for this "but for" test of consular functions from any court, foreign or domestic, and this Court rejects it. If a consular officer participated

in a conspiracy to distribute drugs by attempting to smuggle drugs into this country by having it delivered in a diplomatic pouch, the act would not suddenly become a consular function. Clearly, conspiracy to distribute drugs is not a consular function, *see Chindawongse*, 771 F.2d at 848; an act in furtherance of a conspiracy by a consular officer which takes advantage of the privileges of that position does not suddenly make it a consular function.

In the alternative, Bijedic argues that his alleged acts fall within the scope of consular functions identified in the Vienna Convention. Article 5 of the Vienna Convention defines "consular functions." Bijedic contends that the acts charged in the superseding indictment are included within subsection (b) and (e) of Article 5. Those subsections provide:

### ARTICLE 5
### Consular Functions

Consular functions consist in:

(b) furthering the development of commercial, economic, cultural and scientific relations between the sending State and the receiving State and otherwise promoting friendly relations between them in accordance with the provisions of the present Convention;

\*   \*   \*   \*   \*   \*

(e) helping and assisting nationals, both individuals and bodies corporate, of the sending State;

\*   \*   \*   \*   \*   \*

■■■■ Although it has been suggested that the Vienna Convention might not provide immunity for *any* criminal act, *See* Milhaupt, 88 Colum.L.Rev. at 861, the accepted view is that both civil and criminal acts may be in furtherance of a legitimate consular function and immunity would then apply. To determine whether an act is performed in the exercise of a consular function, the Court must consider: "(1) whether there is a logical connection between the act and the purported function; and (2) whether the act is a reasonable

means to the fulfillment of the function." *Gerritsen v. Escobar Y Cordova*, No. CV 85–5020, slip op. at 15 (C.D.Cal. September 16, 1988). Some of the relevant criteria in determining these issues are: (1) the subjective intent of the consular official, based on objective evidence, in performing the act; (2) whether the act furthered some function of the consulate; (3) whether the act is of a "personal character"; (4) the seriousness of the act; and (5) the absence or presence of a malicious motive in the performance of the particular act. *Id.* (citations omitted). In addition, the Court may consider whether the act is part of a prolonged course of criminal conduct. *State of Vermont v. Kent–Brown*, No. 1501–4–88 slip op. at 12 (Dist.Ct.Vt. filed July 15, 1988).

As the facts are alleged in the superseding indictment, the Court finds that Bijedic is not charged with committing illegal acts performed in the exercise of consular functions, as defined in the Vienna Convention. None of the acts charged in the superseding indictment would promote friendly relations between the United States and Yugoslavia; therefore, Article 5(b) would not provide a basis for the applicability of immunity.

■■■■ Bijedic also contends that the alleged acts assisted Yugoslavian nationals under Article 5(e) of the Vienna Convention. Although helping a national elude prosecution after arrest may be considered "helping and assisting" that national under Article 5(e), *see State of Indiana v. Strom*, No. 45G03–8801–CF–00010, slip op. at 11 (Ind.Super.Ct., Crim.Div. September 30, 1988), assisting a national in committing a crime does not fall within Article 5(e). In the case *sub judice*, the superseding indictment does not charge Bijedic with helping Spanjol[4] elude U.S. authorities after arrest. Rather, Bijedic is charged with participating in a conspiracy to launder illegal proceeds. If Bijedic assisted Spanjol, he assisted him in breaking U.S. law. This would not be a reasonable means of fulfill-

---

**4.** For the purposes of this argument, the Court will assume Spanjol is a Yugoslav national; Bijedic is not charged in the superseding indict- ment with any acts involving any other persons who could be considered Yugoslav nationals.

ing the legitimate consular function described in Article 5(e). Accordingly, Bijedic does not qualify at this time for the immunity afforded to consular officers under the Vienna Convention.[5]

### VII. *Motion to Recover Items Wrongfully Seized:*

■ Before the Court is Bijedic's Motion to recover items which Bijedic alleges were wrongfully seized from his hotel room and suitcase on December 4, 1988. This Motion is properly before the Court pursuant to Fed.R.Crim.P. 41(e). In accordance with that rule, the Motion to Recover Items Wrongfully Seized is also considered to be a Motion to Suppress under Rule 12 because an indictment has already been filed.

Bijedic alleges that after he was arrested on December 1, 1988, he was held in custody until the next day. Bijedic was released on December 2, 1988 on bond, and he was ordered to remain in view of the United States Customs officers. When he was released, Bijedic's personal items were returned to him. Bijedic then flew to Philadelphia, accompanied by two Customs agents. Bijedic checked into a hotel with the two agents; Bijedic occupied one room of a two room suite, and the agents occupied the adjoining room. The rooms were separated by a door, which the Government alleges was open at all times.

On December 4, 1988, while Bijedic was meeting with his attorney in the restaurant of the hotel, Bijedic was informed that the agents were searching his room and his belongings. Bijedic went to his room with his attorney and observed four agents searching his belongings. After Bijedic's attorney made a strong objection to the search, the agents agreed to place the seized items in a sealed evidence envelope, pending a resolution by this Court.

Assuming, *arguendo*, that the search of Bijedic's room and belongings were in violation of the Fourth Amendment to the United States Constitution, the Court will not order that the Government return the seized items at this time. "It is well established that the Government can retain property in which it has some legitimate governmental interest." *United States v. $101,050.00 U.S. Currency*, Misc. No. 88–0553, Civ. No. 88–9567, slip op. at 2, 1989 WL 16199 (E.D.Pa. February 24, 1989). *See also, United States v. Premises Known as 608 Taylor Ave., Apartment 302, Pittsburgh, Pennsylvania*, 584 F.2d 1297, 1304–05 (3d Cir.1978). Evidence obtained illegally by the Government, although inadmissible in the Government's case-in-chief, may be properly used for impeachment purposes. *United States v. Havens*, 446 U.S. 620, 627–28, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (1980). Illegally obtained evidence that may be properly used under *Havens* may be retained by the Government. *United States v. Gorny*, No. 86–CR–589, 1986 WL 12602 (N.D.Ill. January 20, 1987).

If the Government attempts to use the evidence in question in its case-in-chief, a hearing on Bijedic's Motion to Suppress will be held by the Court. Bijedic may renew his Motion under Fed.R.Crim.P. 41(e) for the return of illegally seized property at the conclusion of the trial.

---

**5.** Bijedic also argues that he is immune from prosecution because the acts charged in the superseding indictment do not constitute a grave crime. In support of this argument, Bijedic cites Article 41 of the Vienna Convention, which provides:

Consular officers shall not be liable to arrest or detention pending trial, except in the case of a grave crime and pursuant to a decision by a competent judicial authority.

This argument fails for two reasons. First, the acts charged in the superseding indictment do constitute a grave crime. A grave crime has been interpreted by the Department of State to mean a felony. S.Exec.Rep. No. 91–9, 91st Cong., 1st Sess. at 14 (1969). *See also,* Milhaupt, 88 Colum.L.Rev. at 853 n. 82. Bijedic is charged with violating 18 U.S.C. § 371 which is a felony. Second, Article 41 does not provide consular officers with immunity for non-grave crimes; rather, it has been interpreted as requiring only that consular officers not be imprisoned until convicted. *See* Report of the International Law Commission to the General Assembly, 16 U.N.Supp. (No. 9) at 28, art. 41, comment 13, reprinted in [1961] 2 Y.B. Int'l L. Comm'n 88, 116.